CITY OF POCATELLO v. MURRAY et al.

(District Court, D. Idaho, E. D. May 16, 1913.)

1. WATERS AND WATER COURSES (§ 189*)—CONSTRUCTION.

A franchise granted by a city to construct and maintain waterworks for the public and to lay, and maintain mains in the streets is subject to the rule that where, on a fair reading of the instrument, reasonable doubts arise as to the intent of the parties, such doubts must be resolved in favor of the public.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 272; Dec. Dig. § 189.*]

2. WATERS AND WATER COURSES (§ 189*) — PUBLIC WATER SUPPLY — FRANCHISES—CONSTRUCTION.

Defendant, under a prior ordinance, having been granted a franchise to construct and maintain waterworks for the use of complainant city, which required him to furnish a sufficient supply both for public and private use of the city and its inhabitants and to convey the same from "Mink creek" and another stream, was granted a new franchise containing provisions beneficial to him and onerous to the public. This ordinance recited that the water furnished was deemed "inadequate for present and future needs, and that defendant agreed to bring in the waters of Mink creek and to make all extensions of street mains warranted by the growth of the city," etc. Held, that the new ordinance did not limit defendants' obligation to the bringing in from "Mink creek" only so much water as was necessary, but that he was bound to bring in all the water from such creek; the same being necessary to afford an adequate supply.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 272; Dec. Dig. § 189.*]

3. WATERS AND WATER COURSES (§ 189*) — PUBLIC WATER SUPPLY — FRANCHISES—CONSTRUCTION OF PIPE LINE.

Where a waterworks franchise not only required defendant to bring in the waters of "Mink creek" to be used as a source of supply but also provided for the construction of a pipe line by which such result was to be accomplished, the work to be commenced within 90 days after the approval of the ordinance and carried to effective speedy completion without unnecessary delays, interruptions, or discontinuances, defendant was bound to construct a completed pipe line at once and was not entitled to construct it in installments at such intervals as he deemed proper.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 272; Dec. Dig. § 189.*]

4. WATERS AND WATER COURSES (§ 189*) — PUBLIC WATER SUPPLY — FRANCHISES—EXTENSION—SUFFICIENCY OF SUPPLY.

Where an ordinance, extending a waterworks franchise, recited that the present supply was insufficient and required defendant to bring in the waters of a certain creek and construct immediately a certain pipe line for that purpose, the ordinance was conclusive of the issue that the present supply was insufficient for such needs as then existed or was likely to arise in the immediate future.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 272; Dec. Dig. § 189.*]

5. WATERS AND WATER COURSES (§ 189*)—PUBLIC WATER SUPPLY—APPROPRIATION—CONTRACT.

Where the sources of a city's water supply, which could be obtained under a gravity system, were limited to the waters of certain creeks,

the city was authorized to contract for the protection of such supply by the appropriation of all the waters of a creek by an ordinance granting defendant a franchise to continue the maintenance, operation, and extension of his waterworks system constructed under a prior franchise.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 272; Dec. Dig. § 189.*]

**6.** WATERS AND WATER COURSES (§ 190*)—PUBLIC WATER SUPPLY—APPROPRIATION—EXTENT.

A present appropriation of the entire waters of a creek for the use of a city was not against public policy because the supply was greater than the city's immediate needs; the rule that an appropriator has a reasonable time to apply the water appropriated to a beneficial use being applicable with even greater liberality to the superior and more elastic needs of a growing municipality.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 268; Dec. Dig. § 190.*]

**7.** WATERS AND WATER COURSES (§ 190*)—PUBLIC WATER SUPPLY—EXCESSIVE APPROPRIATION.

Where a city's appropriation of the entire waters in a stream for a public water supply is greater than the immediate necessities of the city, the appropriation would nevertheless be consummated and the right held intact by a temporary application of any surplus waters to other beneficial uses.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 268; Dec. Dig. § 190.*]

**8.** WATERS AND WATER COURSES (§ 189*)—FORFEITURE—BREACH OF CONTRACT.

Where the grantee of a waterworks franchise has committed a substantial breach of his contract to furnish the city an adequate water supply and to bring in all the waters of a certain creek therefor, the franchise is subject to forfeiture at the suit of the city, provided it comes into court with clean hands and is willing to do equity.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 272; Dec. Dig. § 189.*]

**9.** WATERS AND WATER COURSES (§ 189*)—FORFEITURE—VIOLATION OF CONTRACT.

Where defendant received and accepted from a city a water franchise requiring him not only to furnish an adequate water supply but also to bring into and render available for the use of the city and its inhabitants all the waters of a certain creek, and defendant, after the expiration of a reasonable time, did neither, but instead installed reducers in the supply pipes to consumers and promulgated a series of unreasonable regulations for the use of water by consumers to reduce the use, the franchise was subject to forfeiture.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 272; Dec. Dig. § 189.*]

**10.** WATERS AND WATER COURSES (§ 189*)—PUBLIC WATER SUPPLY—FLAT RATE.

Where defendant, to whom a waterworks franchise had been granted, contracted for the flat-rate system of distribution, and also bound himself to furnish an adequate supply, he would be presumed to have contemplated such extravagance of use as was ordinarily and necessarily incident thereto.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 272; Dec. Dig. § 189.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**11. WATERS AND WATER COURSES (§ 189\*)—PUBLIC WATER SUPPLY—ADEQUACY —REASONABLE USE.**

Whether the holder of a waterworks franchise has furnished an adequate water supply as required by his franchise must be determined with reference to the rule of reasonable use.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 272; Dec. Dig. § 189.\*]

**12. WATERS AND WATER COURSES (§ 203\*)—PUBLIC WATER SUPPLY—MINIMUM CHARGE.**

While a water company, furnishing water to a city under franchise, may provide a minimum charge for meter service, such charge must be reasonable in amount and uniform in application.

. [Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 289, 290–299; Dec. Dig. § 203.\*]

**13. WATERS AND WATER COURSES (§ 202\*)—PUBLIC WATER SUPPLY—USE—REGULATION.**

Where a defendant furnished water to a city under franchise requiring an adequate supply, rules prohibiting the use of water for sprinkling except between the hours of 6 and 8:30 o'clock p. m. and limiting such use to sprinkling through a hose with a nozzle one-fourth of an inch in diameter, and then only when held in the hand, were unreasonable.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 276; Dec. Dig. § 202.\*]

**14. WATERS AND WATER COURSES (§ 189\*)—PUBLIC WATER SUPPLY—USE OF WATER—SPRINKLING GARDENS.**

Where, though a waterworks franchise did not in terms provide for the sprinkling of gardens, flower or vegetable, the schedule rates provided for "lawn sprinkling" at so much "a lot," defendant was required to furnish water for gardens.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 272; Dec. Dig. § 189.\*]

**15. WATERS AND WATER COURSES (§ 189\*) — PUBLIC WATER SUPPLY — FRANCHISES—FORFEITURE—REMEDY.**

Provision of an ordinance granting a franchise to construct and maintain a city water plant, containing a stipulation that in case defendant did not furnish a sufficient amount of water the city might bring in an additional supply, did not constitute an exclusive remedy precluding the city from maintaining a suit to forfeit the franchise on defendant's failure to furnish an adequate supply, etc.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 272; Dec. Dig. § 189.\*]

**16. WATERS AND WATER COURSES (§ 189\*)—FORFEITURE—NOTICE.**

Notice of a city's intention to institute suit against the grantee of a waterworks franchise to cancel the same because of his failure to perform and to furnish the city an adequate supply of water was not a necessary element of the city's right to maintain the action.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 272; Dec. Dig. § 189.\*]

**17. WATERS AND WATER COURSES (§ 189\*)—FORFEITURE—REMEDY.**

It was no defense to a city's suit to forfeit a waterworks franchise that the city might rescind by resolution; such remedy not being necessarily adequate.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 272; Dec. Dig. § 189.\*]

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Suit by the City of Pocatello against James A. Murray, doing business as the Pocatello Water Company, and another. Decree for complainant.

See, also, 173 Fed. 382.

D. Worth Clark and P. C. O'Malley, both of Pocatello, Idaho, for complainant.

N. M. Ruick and J. H. Hawley, both of Boise, Idaho, for defendants.

DIETRICH, District Judge. The suit is brought for the cancellation of a franchise, granted to the defendant June 6, 1901, and relating to the furnishing of water for the use of the plaintiff and its inhabitants, as appears from its ordinance numbered 86. A copy of the ordinance is attached to the amended bill, and on its face, as well as from the averments of the pleadings, it is shown that at the time of its passage the defendant owned and was operating the system by which the city was supplied with water, under a former ordinance, numbered 59 (passed June 8, 1898), which was in favor of the Pocatello Water Company, a corporation, and confirmed and continued in it as assignee certain rights and privileges theretofore conferred upon the defendant and his then associates, F. D. Toms and John J. Cusick, by ordinance numbered 46 (passed January 4, 1892). The Pocatello Water Company later assigned all of its rights under both ordinances to the defendant.

The city contends that defendant has violated the provisions of ordinance 86 in material respects and for that reason seeks a decree relieving it from any further obligations thereunder. With one possible exception, the substantial defaults alleged and relied upon all relate to the adequacy of the amount of water supplied by the defendant, and the controlling question therefore is whether the defendant has fulfilled his obligations in this respect.

In the main the city and its inhabitants are dependent upon the defendant's system. The Oregon Short Line Railroad Company supplies its needs from a plant of its own, and there are a few private wells; and there has recently been constructed an open ditch, from which, by the use of pumps and other devices, water may be procured for irrigation purposes in certain quarters. Other than the railroad supply, however, these exceptions appear to be unimportant, if not wholly negligible.

The water delivered by the defendant is procured from three small mountain streams, referred to in the record as Mink, Gibson Jack, and Cusick creeks. The flow of the first named during the dry season of each year may be roughly stated as three cubic feet per second, of the second as two cubic feet, and of the last as a small fraction of a second foot. A pipe line about six miles in length, and with a theoretical capacity of approximately .75 of a second foot, diverts water from Mink creek and discharges it into Gibson Jack. Pipe lines from Gibson Jack and Cusick creek discharge into what is known as the upper reservoir, which serves not only to impound, and thus to equalize, the supply of water, but also to free it from silt and other sedimentary

matter. From this reservoir pipe lines lead to the middle and lower reservoirs, which are connected by a pipe line, and from both of which mains lead to the city distributing system, which, so far as appears, is of the usual type. The reservoirs are situate on the "bench" or mesa near the city, with a sufficient elevation to give ample pressure, and are substantially built. At the time of the passage of ordinance 86 no water was being used from Mink creek; the pipe line from that stream was built shortly thereafter; and later the middle reservoir was constructed and the lower one was remodeled.

The water is used by the municipality for street sprinkling and for protection against fire and by the inhabitants for domestic and manufacturing purposes and during the summer season for their lawns, trees, and gardens. Since the passage of the ordinance, as appears both from the United States census and other evidence in the record, the population of the city has about doubled, it now being approximately 10,000; and it is fair to conclude that the needs for which water is required have increased at least 100 per cent. Admittedly the water is wholesome, and the supply thereof is ample except during the summer season, when large quantities are used for street sprinkling and lawns, and during that season there has been complaint nearly every year for the last nine or ten years. As early as 1905 it appears that the situation was thought to be so acute that the city officials, taking cognizance of criticism by citizens and the public clamor because nothing was being done to compel the defendant to furnish a greater supply, called a mass meeting for the purpose of discussing ways and means of improving the conditions and, if possible, of devising a remedy. In the year 1911 all the reservoirs ran practically dry, and as a consequence the city was without adequate fire protection. Much bitterness prevailed, and finally, either as the result of a judicial proceeding or of threats by the city authorities to commence such a proceeding (it is not clear which), an arrangement was made by which the management of the plant was temporarily taken out of the hands of the defendant's superintendent. With the exception of the small volume of water that may be stored in the middle reservoir, the capacity of the system to supply the summer needs of the city has not been increased since the construction of the Mink creek pipe line. No meters have ever been installed, but "flat" rates are charged in accordance with a schedule thereof incorporated in the ordinance itself.

The provisions of ordinance 59 are not highly material to the present consideration. As already stated, it reaffirmed the grant of ordinance 46, and it also established a schedule of water rates and required the water company to substitute a steel pipe for the wooden flume by which the waters of Gibson Jack creek were carried to the reservoirs. It contains nothing else of importance.

Ordinance 46 grants to defendant and his associates the right generally to lay pipes in the streets of, and to supply water to, the city of Pocatello and its inhabitants for the period of 50 years. Certain conditions are imposed: (1) The grantees were to complete the plant and be ready to deliver water within a certain specified period; (2) the water supplied was to "be conveyed from the creeks on the Ft. Hall

Indian reservation, known as Mink and Gibson Jack creeks," and was to be "sufficient to supply both the public and private use and purpose of the citizens and inhabitants of the town of Pocatello," and was to "be of pure and healthful quality"; (3) the water was to be conveyed to, and confined in, "a suitable and substantial reservoir or reservoirs," at a point above the town, so as to furnish a pressure of at least 150 pounds. The immediate laying of certain prescribed mains and laterals for the distribution of water is required, and it is added that "thereafter main pipes and laterals may be laid as the occasion or consumption demands." There are no other material provisions.

Turning now to ordinance 86 and analyzing it in the light of the conditions thus briefly sketched, what obligations does it impose upon the defendant, and has he substantially fulfilled them? In one aspect the question turns upon the construction of the contract itself, the material facts being undisputed; and in another upon the view which may be taken of facts touching which the testimony is, in its implications at least, highly conflicting.

[1] Undoubtedly the ordinance falls within the general rule applicable to grants of franchises that where, upon a fair reading of the instrument, reasonable doubts arise as to the intent of the parties, such doubts must be resolved in favor of the public. Stein v. Bienville Water Supply Co., 141 U. S. 67, 80, 81, 11 Sup. Ct. 892, 35 L. Ed. 622. There is nothing in Bellevue Water Co. v. City of Bellevue, 3 Idaho (Hasb.) 739, 35 Pac. 693, or Jack v. Village of Grangeville, 9 Idaho, 291, 74 Pac. 969, to the contrary. One of the reasons generally assigned for the rule is that such instruments are usually drafted by able counsel representing the grantee, and strong internal evidence is not wanting that the present agreement was so prepared. But, be that as it may, the rule of construction is so well established that the reasons upon which it rests need not be discussed.

[2] The only provisions of the ordinance purporting to be onerous to the defendant, or to impose upon him obligations with which he was not already charged under pre-existing franchises, are found in a paragraph of the preamble, which reads as follows:

"Whereas the present supply of water furnished by said water system [the existing one] is deemed inadequate for the present and future need of said city [Pocatello], and said James A. Murray agrees to bring in the waters of Mink creek, and to make all extensions of street mains warranted by the growth of said city, thereby necessitating the laying of several miles of pipe, at a large additional expenditure of money."

The substantive part of the instrument is all beneficial to the defendant: It declares that his existing rights and privileges are confirmed and continued in effect; that the then existing water rates were fair and should not be altered for a period of five years, and then only upon certain conditions and in the manner therein specified; that no other person or corporation should be granted a franchise upon more favorable terms; that the city itself should not construct or operate its own system in competition with the defendant until it should have first in good faith offered to purchase his plant at a price to be fixed by a board of engineers in the manner expressly prescribed, the purchase to be made under conditions with which the city could not com-

ply without the greatest difficulty, if at all; and that the city should rent and pay for at the scheduled rates at least 45 fire hydrants. Sections 6 and 8, which doubtless relate to the paragraph already quoted from the preamble, are as follows:

"Section 6. Within ninety days from and after the passage and approval of this ordinance, the said James A. Murray shall commence or cause to be commenced the improvements mentioned in the preamble hereto, and shall carry the same to effective and speedy completion, without unnecessary delays, interruptions or discontinuances, such compliance with this ordinance shall entitle said James A. Murray, his successors or assigns, to the benefits of its provisions, as in virtue of an executed contract; but if more than ninety days shall elapse without such commencement this ordinance shall be and the same is hereby declared null and void."

"Section 8. If at any time the said James A. Murray, or his successors or assigns, fails to supply sufficient water for the needs of the city of Pocatello and the inhabitants thereof, then it shall be optional with the city of Pocatello to secure a further supply of water from any other source, directly or indirectly, without reference to the provision of this ordinance: Provided, however, that said James A. Murray shall have a reasonable time in which to complete the improvements contemplated by this ordinance, or such further improvements as may hereafter become necessary to supply sufficient water as aforesaid before the provisions of this section shall apply."

The agreement of the defendant to "make all extensions of street mains warranted by the growth of" the city imposed upon him no new obligations; the duty so to do was clearly implied by ordinance 46. Under it, as we have seen, the grantees were bound to furnish water to the city and its inhabitants, and they were given the privilege of laying pipes in the streets for its proper distribution. Certain mains and laterals were deemed to be indispensable and immediately necessary, and these they were required to lay at once. As to other pipes and laterals which might become necessary to enable them to fulfill their primary obligation of delivering water to the city and its inhabitants, the city waived the right of having them laid in advance of any actual need therefor and consented that they might be provided from time to time "as the occasion or consumption demands." If, therefore, the city received any consideration at all for the onerous terms of ordinance 86, it consisted solely and exclusively of such new obligation, if any, as was imposed upon the defendant by his agreement "to bring in the waters of Mink creek"; and whether this clause does or does not create a new obligation depends upon whether we adopt the construction contended for by the city or that urged by the defendant. By the city it is said the defendant thus agreed to bring in all the waters of Mink creek, and by the defendant only such portion thereof as might be reasonably necessary from time to time to supply the public needs. In any view that may be taken of the issue of fact touching the shortage of water, relative to which the evidence is conflicting, what, under this clause of the ordinance and upon the undisputed facts, is the defendant's position? Admittedly the pipe line from Mink creek is of a capacity little, if any, more than sufficient to carry one-fourth of the flow of Mink creek, even in the low-water season, and therefore if his agreement was to bring in all the waters of the stream he has in a vital matter substantially failed to perform. If, upon the other hand, in accordance with his contention,

it be held that by this provision he was required to bring in only such water as was reasonably necessary, then the ordinance must be held to be ineffective and nonenforceable, for in that view it is wholly without any consideration whatsoever, a mere nudum pactum. Before it was passed the defendant, by virtue of ordinance 46, stood expressly obligated to furnish water "sufficient to supply both the public and private use and purpose" of the city and its inhabitants and to convey the same from *Mink creek* as well as Gibson Jack. Such a construction would therefore be fatal to the entire defense, for under it the ordinance becomes a nullity and ineffective either to confer any right upon the defendant or in any respect to bind the plaintiff.

But it is thought that such a view of the meaning of the stipulation cannot be maintained. It is not to be presumed that either the city authorities or the defendant intended to perpetrate a fraud upon the public. It is conceded upon behalf of the defendant that the language of the ordinance is susceptible to the construction urged by the city. Indeed, it can hardly be controverted that such is the natural import of the language; the defendant agreed, not "to bring in *water from* Mink creek," but to "bring in *the waters of* Mink creek." The stream is a small one, and it may be readily conceived that both parties were of the opinion that the entire flow was required to supply needs which, if not wholly instant, were so near at hand that immediate provision should be made therefor.

[3] The phraseology is wholly inappropriate to convey the limited meaning for which the defendant contends; nor is the language in any other part of the instrument favorable to such a construction. There is no intimation that the necessary conduit was to be added to or increased from time to time as there might be need. Not only were the "waters of Mink creek" to be brought in, but the construction of the pipe line by which this result was to be accomplished was to be commenced within 90 days after the approval of the ordinance and carried "to effective and speedy completion without unnecessary delays, interruptions, or discontinuances." Such language leaves no room for the theory that pipe lines were to be constructed in installments at such intervals as the defendant might deem to be proper. Force is added to this view by the present strenuous contention of the defendant that the waters of Gibson Jack and Cusick creeks not only were at the time of the passage of the ordinance, but still are, more than sufficient to supply all of the plaintiff's needs.

[4] If that be the case, and if we adopt the defendant's theory of the meaning of the ordinance, it necessarily follows that the waters of Mink creek never have been needed, and that therefore defendant never has been under any present obligation to construct a pipe line, either large or small, and that he may at his option, without violating any of the rights of the plaintiff, tear up the line which he did build. It is reasonable to infer that one of the purposes of the ordinance was to put at rest the question of the sufficiency of the supply, and to forestall and prevent just such a controversy as has here arisen, by definitely providing that the waters of Mink creek, which were admittedly sufficient for such needs as then existed or were likely to arise in the immediate future, should be made available and put at the service of

the city. Moreover, in the light of experience, and of facts in the record, and of what other municipalities have been doing, such was the course dictated by prudence and reasonable foresight. It appears that the sources from which a gravity supply for the plaintiff can be procured are limited, and of these the streams hereinbefore named are the most desirable.

[5] Under the system of water appropriation which prevails in this state, rights of private individuals might be initiated and become vested in the waters of Mink creek at any time. The city's present and future interests, therefore, demanded that any claim which the defendant at that time had the right to make or to initiate, to the waters of Mink creek, should be perfected and protected by the construction of the requisite means for the diversion and application of the water to a beneficial use. It was competent for the city to contract for such protection, and its desire so to do, it is reasonable to presume, was one of the moving considerations for submitting to the conditions imposed upon it by the ordinance.

[6] The contention that it would have been against public policy for the defendant to have appropriated more of the public waters than was necessary to supply the immediate needs of the city, and that therefore the construction of a larger conduit would have been a vain thing, is without merit. Under the law of the state an appropriator has a reasonable time to apply the water which he has appropriated to a beneficial use, and if such rule may be invoked in the case of an appropriation for agricultural purposes it should, and doubtless would, be applied with even greater liberality to the superior and more elastic needs of a growing municipality.

[7] Besides, if not required for the immediate necessities of the city, the appropriation could have been consummated and the right held intact by a temporary application of any surplus to other beneficial uses. Upon this branch of the case, the conclusion is unavoidable that the defendant's failure to bring in and make available for the uses of the plaintiff the waters of Mink creek constitutes a substantial breach of his contract.

[8] It remains to consider whether, upon such breach, and in the light of the other facts of the case, the plaintiff is entitled to the relief prayed for. That under proper conditions equity will declare forfeit and cancel a contract of the character of that under consideration is well settled. City of Columbus v. Mercantile Trust Co., 218 U. S. 645, 31 Sup. Ct. 105, 54 L. Ed. 1193; Farmers' Loan & Trust Co. v. Galesburg, 133 U. S. 156, 10 Sup. Ct. 316, 33 L. Ed. 573; City of St. Cloud v. Water, Light & Power Co., 88 Minn. 329, 92 N. W. 1112; Capital City Water Co. v. State, 105 Ala. 406, 18 South. 62, 69 L. R. A. 743; Grand Haven v. Water Works, 99 Mich. 106, 57 N. W. 1077; Water Co. v. Jackson, 73 Miss. 598, 19 South. 774; Palestine Water Co. v. City of Palestine, 91 Tex. 540, 44 S. W. 814, 40 L. R. A. 203; Ennis Water Works v. City of Ennis (Tex. Civ. App.) 136 S. W. 513. Upon the other hand, forfeitures are not favored at the law, and a party seeking equitable relief must come into court with clean hands and be willing to do equity.

[9] Bearing in mind these principles, we may briefly consider the

issues of fact, and especially the general question of the sufficiency of the water which the defendant has supplied. The most striking feature of this branch of the case is the meagerness of available data. Incredible as it may seem, it appears to be the fact that in the face of the more or less continuous complaint, during a period of nine or ten years before this suit was commenced by the citizens and the city officers, of a shortage of water, no effort appears ever to have been made by the defendant to measure the amount of water he was actually delivering into the city. An experiment was made with the Mink creek line soon after its construction for the purpose of determining its capacity, which, if we assume that the pipe is always entirely free from obstructions, and that there are no leaks, should give a result approximately correct. The velocity of the flow was ascertained by putting into the water, a short distance below the intake, a harmless stain and then observing the length of time required for the water so discolored to pass through the entire length of the pipe. Thus, having the size of the pipe and the velocity of the flow therein, it required only a simple mathematical calculation to ascertain the theoretical discharge, which, according to the testimony of the defendant's superintendent, who made the experiment, was .78 of a second foot. But of course it does not follow that such is the actual delivery, averaged during the season, or, indeed, at any given time, and especially when we consider the length of time which has elapsed since the pipe was laid. It is of sheet steel, the life of which under various conditions is uncertain, and is approximately six miles in length, with numerous lateral angles and curves, and going over hill and down dale. Silt settles in the lower parts to such an extent that it is necessary at such points to maintain valves or gates through which at intervals the water may be "blown off" or wasted in such a manner as to carry with it the accumulated sediment. Air valves are maintained upon the high points which must be opened and closed by hand, and it seems, when many of these are open, the water will not flow through the pipe at all, and the opening of any considerable number greatly curtails the flow. Moreover, in a pipe of this character and of such length, it would seem to be unavoidable that leaks should develop from time to time, and, with no means of measuring the actual intake and discharge from day to day, these might well wholly or at least for a considerable length of time escape discovery. It is therefore obvious that the actual discharge of the pipe never reaches the theoretical discharge and at times is likely to be only a fraction thereof. If the pipe at any point is half full of sediment, the discharge will be proportionately curtailed, and it is apparent that nearly all the time the capacity of the pipe is thus measurably contracted, for in the nature of things the process of blowing off cannot be continuous, but must be only at intervals, when the daily increment has resulted in a considerable deposit of silt. In fact, the process of "blowing off" itself necessarily diminishes the serviceable capacity of the pipe to the extent of the amount of water so wasted. And the record leaves no doubt that the amount of the actual delivery is likely at all times to suffer some diminution by reason of leaks and open air valves. In view of these considerations, I am in-

clined to think that the box measurements of the water discharged from the pipe into Gibson Jack creek made by engineers acting for the city in the summer of 1911 are, while meager, the most accurate and reliable data which we have touching the actual capacity of the line, and I therefore find that the amount of water brought by the defendant from Mink creek and commingled with the waters of Gibson Jack is .56 of a second foot. True, it is sought to cast doubt upon the accuracy of these measurements by the suggestion that at the time they were taken some of the air valves in the line were open and that consequently the flow was materially impeded, but such a theory rests upon nothing more substantial than hearsay testimony on the part of the superintendent, which was to the effect only that he was informed that such was the fact; he had no knowledge thereof.

The only other measurement anywhere upon the system at any time was made about the time this suit was commenced and covered all of the water coming into the defendant's reservoirs. The facts pertaining thereto rest exclusively upon the uncorroborated testimony of the superintendent. He states that the pipe line carrying the water from Gibson Jack creek and discharging it into the upper reservoir was left open, and the outlets of the reservoir were closed, and thereupon an observation was taken of the length of time required to raise the level of the water a certain distance. Thus, having ascertained the length of time required for the discharge of a given volume of water, the discharge per second could be easily calculated. Assuming the measurements of the reservoir to be correct, and that the time was carefully noted, there could be no question of the practical accuracy of the result, which, as stated by the superintendent, was about 3.15 second feet.

The testimony of the plaintiff's engineers tends strongly to show that when their measurements were taken in the summer of 1911 the total flow of Gibson Jack and Cusick creeks, supplemented by the water brought from Mink creek, amounted to 2.56 second feet. But, even if we should accept the figures of the defendant's superintendent as being fairly accurate, we are still without data of the most important character to enable us to answer the ultimate question whether an amount of water reasonably sufficient for the needs of the city has been actually delivered to consumers. During the trial it developed that ordinarily in water systems such as this there is an enormous loss through leakage in conduits between the source of supply and the point of use. The superintendent of the San Francisco water system, called as an expert by the defendant, testified in effect that in his experience he had found such loss to be approximately 50 per cent. His testimony stands undisputed, and the record throws no light upon the question whether in this manner the defendant's system wastes more or less than this percentage. Service meters have never been installed, and therefore we are wholly without direct information touching the amount of water actually delivered to consumers, and for want of measuring devices anywhere in the mains or principal laterals we have no means of ascertaining even what quantity is delivered at the city limits. Indeed, so far as appears no provision is made in the defendant's system for the detection of leaky joints, and therefore great loss

might go on indefinitely without discovery. In the absence of data touching such loss, it is apparent that whether we take the measurements of the plaintiff's engineers of the amount delivered into the upper reservoir, or that of the defendant's superintendent, or if we strike an average between the two, we are still wholly unable to make even a fair approximation of the amount actually delivered to consumers. Is the waste through leakage 50 per cent, as in San Francisco, where efforts are made to detect and stop the leaks, or is it 60 per cent. or 25 or 40; it is a matter upon which we can only guess or conjecture. With the record in that state, any deductions at all as to the sufficiency of the water supply would seem to be unwarranted; but, if any such deduction were to be made, we should, for the want of a better or more reasonable course, be under the necessity of assuming the loss by leakage to be approximately 50 per cent. Upon that theory, and if, as is reasonable to assume, the duty of water for lawns is no greater than for agricultural crops, the supply would scarcely be sufficient to sprinkle the lawns, which aggregate in excess of 100 acres, leaving nothing for other uses.

Other factors necessarily entering into the calculation of the sufficiency of the supply are left in equal uncertainty. If the contrary were not here conclusively shown, it would be reasonable to presume the existence of a standard of usual consumption of water per capita approved by experience, at least for ordinary domestic and municipal purposes, and exclusive of use for lawns and gardens, but the published data disclose the most astonishing diversity, and admittedly there is no recognized standard. As to the amount required for lawns, gardens and trees, there is apparently no recorded experience at all, and, except in so far as such use may be found analogous to the irrigation of agricultural lands, the question is left almost entirely to conjecture. Definite and credible information is furnished touching the area of lawns and gardens watered from the defendant's system, but the testimony is strikingly conflicting as to the number of people who depend upon it for domestic uses. One fact is put beyond all peradventure: Justly or unjustly, the inhabitants of the city, with remarkable unanimity, entertain the view that during the summer season the water supply is radically deficient. The fact is established by overwhelming evidence, and even two of the three citizens called by defendant for the apparent purpose of establishing a different view upon cross-examination reluctantly made admissions strongly tending to corroborate the witnesses for the plaintiff. It is abundantly shown that to a degree lawns frequently become parched and trees lose a part of their leaves in the middle of the summer; and that during certain years for a considerable period of time the water has been entirely shut off from the city for several hours each day. To meet the apparent shortage, when it first began to be serious, the defendant, instead of enlarging the intake and bringing in the waters of Mink creek as by his contract he was required to do, went to the expense of thoroughly equipping the system with what in the record are referred to as "reducers," a device by which the one-half inch opening from the main into the service pipe of each consumer was reduced to one-fourth of an inch, and the two-inch goosenecks from which water was deliv-

ered into the city sprinkling carts were reduced to about one-half of an inch. Conceding his inability at times to maintain the required pressure for fire protection, and that during the summer season there is a measure of inconvenience and suffering for want of sufficient water, the defendant asserts that the shortage is due to a wasteful use, apparently not by all of the citizens, but by a small percentage thereof. There is, however, no substantial evidence of abnormal waste. Some waste there is bound to be where there are so many consumers, even under a meter system, and it may be fairly assumed that where, as here, flat rates are charged, there is a much greater percentage of waste than where meters are used. Where economy in the application of water is unsupported by considerations of self-interest on the part of the consumers, the general tendency is of course toward liberality, if not extravagance, of use, and then there are always, in every community, people who, even to the injury of others, will waste when the waste is without cost to them.

[10] But the defendant, having contracted for the flat-rate system, must be presumed to have contemplated such extravagance of use as is ordinarily and necessarily incident thereto. He agreed to furnish a sufficient supply of water under a system which he must have known is everywhere and always attended with a use less economical than where the charge is based upon the amount consumed. It must therefore be held that he anticipated that the more prodigal use would necessarily prevail, and assented thereto, and he cannot now be heard to say that he has fulfilled his contract obligation because, while the amount supplied is insufficient under the system with respect to which the obligation was expressly assumed, it might be sufficient under some other system. I am not to be understood as directly or indirectly sanctioning the wasteful use of water; that is to be deprecated and, if persisted in, should not only be condemned but appropriately punished. But we must consider conditions as they are and not as we would like to have them to be. Unfortunately the flat-rate system was contracted for, and neither party can make the substitution of a better system without the consent of the other, and thus far negotiations to that end have been without result. While admittedly there is substantially no direct evidence of abnormal waste, it is contended that the implications from the testimony of hydraulic engineers called by the defendant are strongly to that effect. Incidentally it may be stated that testimony of a similar character adduced by the plaintiff strongly implies an insufficient supply. But it must be apparent that this so-called expert testimony, both of the plaintiff and the defendant, is of little weight. Admittedly there is no recognized standard of reasonable per capita consumption anywhere or under any conditions. It is also conceded that published experience of the amounts of water actually furnished to and consumed by municipalities fails to approach a reasonable degree of uniformity and is therefore of little value. Indeed, it is not pretended by the witnesses for the defendant that their opinions upon the per capita amount reasonably required are based upon actual use; and, generally speaking, their views seem not to be in harmony with such experience as is disclosed by the reported data. They simply state to us what in their opinion the consumption ought

to be. So far as appears, none of these witnesses ever made or observed any systematic tests or experiments whatsoever. One of them, the defendant's superintendent, measured the water which during a single season was consumed at his home in Pocatello, and another one, acting in like capacity for the company that supplies water to the town of Clarkston, in the state of Washington, made a similar experiment. While they are all hydraulic engineers, that fact in itself implies no special fitness to judge of the amount of water required to irrigate a lawn or to supply the domestic needs of an ordinary family. Possibly the duty of water for such purposes may at some time be properly classified as a branch of the science of hydraulics, but plainly it cannot be so considered now, for the very good reason that in the absence of scientific data the subject cannot be classified as a science at all under any head, and in the absence of such data I see no reason for holding that an intelligent householder is not quite as well qualified to express an opinion touching the amount of water which he reasonably requires to supply the needs of himself and family as is an engineer, especially if the latter be not a householder. How, for instance, can an engineer speak with authority upon the question of the amount of water required for a lawn if both his books and his experience are absolutely silent upon the subject? While the two experiments, the one at Clarkston and the other at Pocatello, are of some value, they are too meager, and the exact conditions under which they were made are too little known to entitle the reported results thereof to be accepted as a criterion.

[11] They were made by persons who were necessarily acting in the interests of water companies, not of consumers, and doubtless it is quite possible in an exceptional case to make a showing wholly out of accord with the results of everyday experience of consumers generally who use water freely and yet without abnormal waste. It must be borne in mind that the question is not how little water a family can get along with and survive; and while we should discourage waste we should not adopt a rule that would make the saving of water by the citizen the paramount object of his existence. People are accustomed to use water freely, and even where the meter system prevails the average man doubtless does not always stop to consider just how little water is absolutely indispensable for his bath or wait until the grass begins to turn brown before sprinkling his lawn. Trees may be merely kept alive with much less water than is required for a luxuriant growth. Individual standards of sufficiency will doubtless be found to differ widely, and even under the meter system, where the incentives for reasonable use are the same with one man as another, what to one consumer may appear to be a generous supply will by another be regarded as wholly insufficient to cover his reasonable needs. Asserting waste as he does, why has the defendant not brought before us substantial and credible data of reasonable use? A controversy over the sufficiency of the supply of water has been going on more or less continuously for ten years, during the most, if not all, of which time the defendant has contended that there was waste in certain quarters; but, as has already been stated, not only has he failed to measure and record the amount of water he was actually deliver-

ing to the city from time to time, but, saving the experiment at the home of his superintendent, he has apparently never made any attempt, intelligent or otherwise, to ascertain the reasonable duty of water in the plaintiff city.

Upon the opening of the case, my first impression was that the city and its inhabitants had been unwilling to give any assistance in solving the problem, by the use of meters, and had obstinately resisted defendant's efforts to that end, but when the facts are all considered the contrary is shown to be the case. It being conceded, as it must be, that generally during the summer season the defendant has in fact been unable to supply all reasonable needs, it necessarily follows that he must assume the burden of showing that the shortage in some quarters has been due to waste in others. In the exercise of reasonable prudence and foresight he must have anticipated that sooner or later, if he would relieve himself of responsibility for the shortage, he must produce satisfactory evidence of waste. Now so far as appears he has never contended, at least not until about the time this suit was instituted, that all or even the larger proportion of the citizens of Pocatello were wasteful in their use of water. In a letter dated October 1, 1907, his superintendent estimated that 10 or 15 per cent. of the users were guilty of waste, and in regulations promulgated and published as late as the year 1912 reference is made to the waste of water by "some of the residents" to the detriment of others whose rights were of equal dignity. Here, therefore, were hundreds of consumers who were presumably making a reasonable use of the water. There were doubtless among them those who had large families, and others having small families, some having comparatively large areas of lawn and trees, and others small. Surely out of all of these the defendant could have made fair selections, and by installing meters, and thus accurately measuring the water consumed by 50 or 75 of such representative patrons for two or three seasons, he could have furnished us with facts which would be highly illuminating and without which we are left to conjecture and surmise. In like manner he could have measured the water consumed by those who, he had reason to believe, were guilty of the most flagrant waste, and with such data we could possibly make some intelligent estimate of the extent of the waste. Clearly it was at all times within the right and power of the defendant to make such tests, if he so desired, without the consent and without regard to the wishes either of the city or its inhabitants; no one could have objected. Nor does it appear that any one was ever disposed to object, or that defendant ever really desired that such tests be made. Some light is thrown upon his attitude by a letter written by his superintendent to a committee appointed by the mayor in the summer of 1905 to secure improved water service and printed as a part of a pamphlet or open letter gotten out by the superintendent a little later. While in the communication itself it is conceded that at least "many" of the committee were personal friends of the superintendent, and therefore presumably not inclined to be unfair, their request that they be permitted to test the amount of water which the defendant proposed to measure to consumers, apparently to supply the amounts

to which they were severally entitled under the flat-rate schedule, was ridiculed and sarcastically declined.

At various times, as early as 1905 and as late as 1911, apparently upon advice that he had the power so to do, defendant adopted and publicly promulgated rules to the effect that in every case of waste he would assume the right to meter future service to the offending consumer, but no meters were ever installed. The only reason assigned for not carrying such rules into effect is the difficulty in determining what amount of water the consumer is entitled to receive for the flat-rate charge, and therefore in determining when an additional charge may properly be made upon the assumption of excessive use. But that is the precise difficulty we have here to meet, and with little, if any, more light upon the subject than was at all times available to the defendant. If, as already suggested, he had followed a rational course, if he had complied with the request of the water committee above referred to, or if upon his own initiative he had installed a number of meters here and there and made tests of the water consumed by those who admittedly were making a reasonable use thereof, he would have had, and we now would have, substantial data in the light of which a line could be drawn with some degree of certainty between ordinary use at least and flagrant waste. It further appears that while ostensibly the defendant was seeking the substitution of a meter system for the flat-rate system, he was in fact unwilling that such substitution should be made upon reasonable conditions. It is to be borne in mind that by virtue of ordinance 86 a contract obligation rested upon the defendant to furnish water at the flat rates therein provided for and to furnish a sufficient supply. If, as we may assume, he found that the flat-rate system of charges operated badly and tended to a wasteful use of water, and thus increased the burden of his obligation, and if for that reason he desired the substitution of a more rational system, he should have consented to meter rates which would operate fairly both ways, but this he was apparently unwilling to do. Both his attitude and that of the city officers upon the subject are disclosed by two proposed ordinances, one of which he caused to be drafted and asked to have passed, and all the provisions of which he apparently insisted upon, and the other of which the city council indicated a willingness to pass. So far as appears, neither party had at the time any information or data from which there could be even an intelligent approximation of meter rates which, upon the assumption of a reasonable, and not a wasteful, use, would be the equivalent of the existing flat rates. The ordinance proposed by the city purported to confer authority upon the defendant to install and maintain meters for the measurement of all water service, both public and private, "at reasonable rates and without distinction of persons." It contained some other conditions, which, however, added practically nothing to the then existing obligations of the defendant. Upon the other hand, the ordinance proposed by the defendant did not purport merely to cover the matter of substituting metered service for the flat-rate service, but contained several provisions radically changing the relations of the parties in other material respects. The life of the defendant's franchise was to be extended, the right of the city to receive water for city purposes was to

be modified, the minimum rate of interest which the defendant was to receive upon his investment was raised from 5 to 6 per cent., and an arbitrary valuation of $600,000 was placed upon the plant; such valuation to serve both as a basis for fixing rates in the future and for the sale of the plant should the city desire to purchase. There were other provisions which it is unnecessary to specify in detail; sufficient has been said to indicate that the ordinance extended beyond the mere matter of substituting a meter system. It prescribed certain definite meter rates, but whether these were in themselves reasonable or unreasonable does not appear, nor does the record disclose their relation to the flat-rate schedule of ordinance 86. But certain conditions were attached which were unreasonable upon their face. It was provided, for instance, that it would be optional with the defendant whether or not in the case of any consumer a meter would be installed, and that, in the event he should not see fit to install a meter, the consumer would continue to be charged at the old rates, thus leaving it within the power of the defendant to make discriminatory charges. And in that connection it was further provided that in no case should the minimum monthly charge for water delivered by meter measurement be less than the then existing flat rates. In other words, with such an ordinance in effect the consumer might expect to have a larger rate to pay, but would have no hope of securing a lower rate, however economical he might be in the use of water. Such a proposition was clearly unreasonable. I do not mean to say that under a system of meter rates a minimum charge may not be reasonably made. A water company must connect up its system with the service pipe, install a meter, from time to time read the meter, and keep individual accounts—services which are necessarily rendered whether the amount of water consumed be large or small—and it is therefore entirely proper that a minimum charge should be made.

[12] But such minimum charges should be reasonable in amount, and they should also be uniform in their application, because such indispensable services are uniform in their burden. The inequitable operation of the provision here referred to may be illustrated: Under the schedule of ordinance 86 the basis charge for a residence or private house is a dollar and a half per month, which was probably intended to cover kitchen supply, lavatory, etc., but if there be a bath in such private residence there is an additional charge of 50 cents, and if a water-closet another charge of 25 cents, so that the minimum charge per month for the ordinary residence with a bath and water-closet is $2.25. Now even if such householder, with one bath and one water-closet, should not use the amount of water which under the proposed meter rates he would be entitled to use for $2.25 a month, he must not only pay the $2.25 but if, for convenience, he installs another bath-tub, and uses practically no more water, and therefore imposes no greater burden upon the water company, he must still pay an additional 50 cents per month. That such a system of minimum charges is unjust seems too plain to require discussion, and the refusal of the city council to accept such a scheme and adopt the proposed ordinance does not signify a disposition to be unfair or unreasonable.

It is further said that in 1912 the defendant promulgated certain

sprinkling rules, and there was little, if any, complaint during that year of a shortage of water, and it is concluded that therefore the shortage in previous years is to be imputed to wide-spread waste. But such a contention is entirely devoid of merit. In the first place, no relation is shown between the assumed sufficiency of the supply in 1912 and these rules, and the conclusion is therefore a mere non sequitur. It does not appear that the rules were observed or enforced, and besides it is shown that during the critical months of July, August, and September of 1912 the rainfall in Pocatello was 3.74 inches, as against 1.08 inches for the same period in 1911. Apparently, therefore, to Providence rather than to the sprinkling rules should be ascribed the credit for such relief as prevailed in 1912.

[13] But in the second place the rules are not thought to be reasonable, and their enforcement could not therefore be recognized as a legitimate means of increasing the normal duty of an insufficient supply of water. It must not be assumed that a rule of practice is desirable or justifiable merely because its observance will result in a saving of water; while water is valuable, it is not the only thing of value; nor must all other considerations give place to that of its conservation. Economy in the use of water, as economy anywhere else, is a relative term, and when the cost of saving a gallon of water is greater than the expense of bringing in an equal amount from an available source the saving is a relative waste, and any rule which imposes upon the plaintiff and its inhabitants a loss of time or of money, in saving water, financially greater than the outlay required to bring from an available source an additional supply should not and cannot be sustained. As we have already seen, the defendant some years ago reduced the apertures through which the water passes from the mains into the service pipes to a quarter of an inch. Now consider that under the rules of 1912 the amount of water which, with a free flow, would pass through such a small opening was further cut down for lawn purposes by the requirement that, after suffering the loss of force or current necessarily due to friction in passing through the requisite length of hose, the water should be sprayed through a nozzle not to exceed one-fourth of an inch in diameter. Again, it was required that all sprinkling in the city must be done between the hours of 6 o'clock and 8:30 o'clock p. m., so that, owing to the limited size of the mains, when the great majority of consumers were using water at the same time, as under such a regulation was bound to be the case, the pressure was materially reduced, thus substantially diminishing the delivery into the service pipes. Add to these restrictions the most noteworthy provision of the rules, and that which is thought to be especially objectionable, namely, the requirement that "the hose through which the water is supplied must be held in the hands of the operator while the sprinkling is being done," and we have a set of conditions which are thought to be highly unreasonable. I do not mean to say that under no conditions could such a regulation be permissible. Doubtless water can be more effectively applied by holding the hose in the hand than by the employment of any of the many patented sprinkling devices designed for the saving of labor and made familiar to us by their common use, and if all available water were being supplied, and the amount were barely

sufficient to meet the needs of all, when applied in the most economical manner, such a stringent rule would doubtless be warranted; but we are not here dealing with emergencies or famine conditions. Or, possibly, if the consumer had the privilege of applying the water at any hour of the day and were furnished with a stream of sufficient volume to enable him to water his lawn expeditiously, the restriction might be tolerated. Here two hours and a half per day are by the rules allowed to the householder for watering his lawn. Presumably for the larger lawns at least all of this time is required; but, if we assume that it requires upon the average only an hour and a half each day, an enormous amount of time in the aggregate is necessarily consumed. Now it is obvious that if the citizen could draw three times the volume of water he could do the required work in one-third of the time, and, if the defendant is to be permitted to insist upon the highest possible efficiency for the water he furnishes, surely he must furnish it under conditions making its efficient application reasonably practicable; if he would benefit by rigid economy of use, he should share in the burdens necessarily incident thereto. According to the testimony of one of the defendant's employés, water is furnished for approximately 850 lawns, each embracing one or more lots. Assuming that it requires upon the average an hour and a half a day to water a lawn, it follows that each day while these rules are in force the inhabitants of the plaintiff city contribute the equivalent of 1,275 hours of time for one man to the conservation of water, or the whole time of more than 150 men, working continuously for eight hours each day, or, estimating such labor to be worth 25 cents an hour, the equivalent of $318.75 per day, or over $18,000 for a period of two months, which, upon a basis of 6 per cent., would cover the annual interest upon an investment of more than $300,000. Clearly the necessity for such a waste of time would not exist if the defendant would bring in the available supply of water in Mink creek and would in part be obviated if the conduits by which the present supply is brought in and distributed were of a sufficient capacity to enable consumers more quickly to procure and apply the amounts to which admittedly they are severally entitled. True, the calculation which I have made involves uncertain factors, and the result is at best but a rough approximation, but it is reasonably conservative and fairly illustrative, and I am unwilling to assent to a policy which seems to have been persistently pursued by the defendant, as evidenced both by the reduction of the capacity of service pipes and the stringent sprinkling rules, of casting upon consumers the entire burden and expense of meeting a condition which he himself could obviate in whole or in part by a reasonable outlay expended in increasing the capacity of his conduits.

[14] The further contention made by the defendant that his contract imposes no obligation upon him to furnish water for gardens may be summarily disposed of. While the ordinance does not in terms expressly provide for the watering of gardens, either flower or vegetable, it is not to be presumed that when it was passed either party thereto contemplated that water would not be used for such purposes. Neither is there any express mention of trees, and if flowers and vegetables can be denied water, by a parity of reasoning trees must also be ex-

cluded. The schedule provides for "lawn sprinkling" at so much a "lot," and doubtless both parties contemplated such use as is ordinarily made of water upon town lots, which common observation teaches us to some degree embraces trees, flowers, and vegetables. No more water is required to cover the cultivated part of a lot than an equal area in grass. So far as appears, prior to the commencement of this action no objection to such use was ever made, and the defendant delivered water and collected for it as for "lawn sprinkling." The long-continued practical construction placed upon an agreement by the parties thereto is of great weight in construing its terms and should prevail here. Plainly the contention is a mere afterthought and is without force. My conclusion upon this branch of the case is that the supply of water furnished by the defendant has generally, during the summer months, been insufficient for the reasonable needs of the plaintiff city and its inhabitants.

[15] Certain technical objections are urged against the maintenance of the suit, but they cannot be sustained. The stipulation in the ordinance to the effect that in case the defendant did not furnish a sufficient amount of water the city might bring in an additional supply was plainly not intended to be an exclusive remedy. Otherwise, immediately upon the passage of the ordinance, the defendant could have accepted it and then sat down and done nothing, and still could hold the city to all of its agreements except the one by which it bound itself not to install a system of its own. Such a construction would render the contract both unreasonable and unconscionable.

[16] Now as to want of notice, if it were true that prior to the commencement of the suit defendant had no warning of the plaintiff's intention to seek a judicial cancellation, the point would be immaterial. No obligation in law rested upon the city to give such notice, and there is nothing inequitable or unfair in the institution and maintenance of the suit. It is not a case where one party has permitted the other in good faith to assume that his acts of performance are satisfactory; the defendant had good cause to know, and did know for years, that the city claimed that he was not fulfilling his obligations. Moreover, the record leaves little room for doubt that through the newspapers, if not otherwise, his superintendent had actual notice of a resolution passed by the city council September 7, 1910, declaring that he had failed to keep his contract, and giving him until April 1, 1911, for performance, in default of which the ordinance was to be held to be null and void. It is not pretended that the water system was in any respect improved subsequent to the date of this resolution, and the defendant has at no time, either before or after the commencement of this suit, offered to meet the plaintiff's demands.

[17] The further objection that the suit is unnecessary, and that if the plaintiff's contentions are well taken the city could rescind by resolution, is not one that defendant can successfully urge. The right of the city may be conceded, but the remedy is not necessarily adequate. Such a resolution would not be legally binding upon the defendant, and sooner or later, unless he were content to abandon the contract, the controversy would have to be litigated in the courts, where only a final adjudication could be had, and until such judicial determination the

rights of both parties would necessarily remain in doubt. It is therefore thought that the course pursued is the more orderly, and hence the preferable one.

Finally the suit was duly authorized. By regular resolution dated August 17, 1911, the mayor was directed to employ special counsel to take action in the courts against defendant for such relief as was available under the law.

Other points raised have been duly considered, but the discussion should not be further prolonged. The defendant having through a series of years persistently declined to carry out the plain provisions of his contract, and having failed to furnish a supply of water sufficient even for immediate needs, has forfeited his right to insist upon performance by the city; and the latter, being free from fault, is entitled to the relief prayed for. It is suggested that it is within the power of the court to enter a conditional decree providing that the contract shall be canceled unless the defendant shall, within a reasonable time to be prescribed, comply with certain specified conditions. Assuming that such power exists, it is not thought that the case is a proper one for its exercise. The defendant has done nothing and made no outlay in excess of what was already required under the original franchise, and surely if, as is confidently asserted by his counsel, the cancellation of ordinance 86 will leave ordinance 46 intact, to grant the relief prayed for will entail upon him no substantial loss or real hardship. By the Supreme Court of the state it has already been finally held that one of the material provisions of the agreement is no longer operative, and upon the whole I am inclined to think that no injustice will be done and the ultimate interests of the parties will be best subserved if it is entirely dissolved. The record is not without abundant evidence that as between the parties there has for a long time been and now is a total want of mutual confidence, seemingly amounting to a temperamental incompatibility, and in the absence of such confidence I am not inclined to undertake the onerous, if not hopeless, task of satisfactorily directing and supervising the performance of an agreement which, by reason of changing conditions and its continuing character, must ever remain executory.

The relief prayed for will be granted; counsel for the plaintiff are directed to prepare a proper form of decree.