[No. 6589]

## CITY AND COUNTY OF DENVER v. BROWN ET AL.

1. IRRIGATING COMPANY—*Carrying Water for Others,* is a *quasi* public carrier, as well as a private enterprise. Where it has water subject to its control *bona fide* applicants are entitled to it, upon making tender of the lawful rate, and complying with the reasonable rules of the carrier.

2. ——*Consumer—His Right*—The right of one who is supplied with water pursuant to contract, from a ditch owned and operated by a carrier company, is limited by his contract, so far as valid, and by the conditions which the law imposes. He does not occupy the exact status of an independent appropriator directly from the stream. Where his contract en-

titles him to a specific volume of water for a particular year, without any valid limitation as to future use, and under such contract he has received the specified volume, and applied it to beneficial uses, he is entitled to the same volume annually thereafter, upon tender of the rate which the irrigating company may lawfully exact, and compliance with its reasonable regulations.

If, after the expiration of his contract, he makes no such tender, nor any legal demand for the water, he is in the same position as though he had never received water from the ditch. His future rights, if any, date from the time when he again contracts with the carrier, or makes a lawful demand to be supplied with water.

And where the contract limits the consumer to a specified volume of water he is bound by this limitation. If by collusion with the employes of the irrigating company he receives a volume in excess of what is specified in the contract, making no payment for such excess, he acquires no right to such excessive volume, in subsequent years.

But where the consumer, by the annual use of the water in a particular volume, has acquired the right to continue in the enjoyment of the same volume, a condition limiting his right, imposed upon him without his consent, and against his protest, is invalid; e. g. where a municipal corporation having acquired the control of the works of an irrigation company, requires even those who are entitled to be supplied therefrom, by reason of such former user, to enter into contracts "subject to the needs and requirements of the city" such contracts, executed under protest, are without effect to limit the right of the consumer to the volume of water before rightfully enjoyed; otherwise as to any volume in excess thereof.

3. ——*Consumer Leasing His Right—Effect*—A municipal corporation beneficially entitled to an irrigating ditch, and having present occasion for only part of the volume diverted, leases the excess to other consumers. Its rights are preserved, as if it had actually applied the water to beneficial uses.

4. ——*Contract Entitling Consumer to a Specified Volume if Applied for by a Specified Date* imposes no obligation upon the consumer. It, in effect, provides for a continuous series of annual transactions, which the consumer may enter into or not at his pleasure. To protect himself as against others applying to the company for, securing, and beneficially using the water, he must exercise the option each year at the appointed time.

One who, having such an optional contract, disposes of his land and afterwards applies for the water when he can make no beneficial use of it, is not entitled to receive the water. To comply with the demand would be mere waste, and the demand is properly denied.

5. Conveyance of Land—*Whether the Right to Water Used for the Irrigation Thereof Passes* depends upon the intention of the grantor, to be gathered from the terms of the conveyance; or, when this is silent, from the circumstances attending the transaction.

6. IRRIGATION—*Defined*—The application of water to the growing of trees upon the streets of a city, or trees, shrubs, grasses and the like, in public parks, is as much irrigation as the application of water to the growth of crops upon farm lands. Neither the farmer nor the municipality, using, or seeking to use water from the same source, has any right superior to the other.

7. DIFFERENT PRIORITIES AWARDED TO THE SAME DITCH—*Rights of Consumers*—The general rule is that all consumers are entitled to be supplied from all the different priorities awarded to the ditch from which they are served. Where the first appropriation was for some special purpose or enterprise, and later priorities were awarded to supply a different class, the latter would be as distinct as if the volumes of the later priorities were conveyed through different canals.

8. PRACTICE IN SUPREME COURT—*Judgment*—Controversy between various persons claiming to be entitled to water from an irrigating canal. Decree reversed, with directions to the trial court to determine the case without further pleadings or evidence, except testimony to establish the relative rights in the different priorities awarded to the ditch, and to provide in the decree for the payment of lawful rates of carriage.

*Appeal from Denver District Court.*—Hon. GEORGE W. ALLEN, Judge.

Mr. H. A. LINDSLEY, City Attorney, and Messrs. ALLEN & WEBSTER, for appellant.

Messrs. CRUMP & ALLEN, for appellees.

GOUDY & TWITCHELL, Attorneys for the J. M. Brown Interests.

S. A. OSBORNE, D. R. PATTERSON, Attorneys for Administrator of E. J. Sanderlin, Claimant.

Mr. JUSTICE GABBERT delivered the opinion of the court:

Appellee Brown, on behalf of himself and others similarly situated, commenced an action against the city and county of Denver and others, the purpose of which was to adjudicate rights to the use of water from a ditch

designated in his complaint "The Platte Water Ditch," but more generally known as the "City Ditch." Various consumers appeared and were made parties. The pleadings are voluminous, and it is not necessary to give a synopsis of them, as counsel for all parties have assumed that they fairly presented the question sought to be determined, which was the respective rights of consumers of water from the city ditch, and we shall treat them accordingly.

Part of the testimony was taken before Judge Armour, and thereafter an order was made, appointing a referee, who, by stipulation, was authorized to consider the testimony taken prior to his appointment, and to receive and consider such further testimony as the parties offered, and from this testimony formulate his findings of fact and conclusions of law, and based thereon, report a decree. He performed his duties in these respects. Some of the consumers other than the city and county of Denver being dissatisfied with the report of the referee, filed exceptions to the report, which the court afterwards heard and sustained in many particulars, and entered a decree from which the city and county of Denver has appealed.

At the outset counsel for appellant contend that as appellees did not file a motion for a new trial after the report of the referee was filed, the exceptions they filed should have been disregarded, and the decree recommended by the referee confirmed by the trial court, and for this reason, the judgment should be reversed and the case remanded with directions to enter a decree in conformity with the one reported by the referee. We think it unnecessary to consider this question, and in disposing of the case, will not consider questions of procedure and practice, the alleged disregard of which does not affect the substantial rights of the parties, but base our opinion

upon questions involved which will tend in the greatest degree to enable a speedy and final disposition of the case upon its merits. ·

In 1860 The Capitol Hydraulic Company was organized under a special act of the territorial legislature of Kansas. This act did not contain any limitation as to the period of the existence of the corporation it authorized to be created, and empowered it to divert the water from the bed of the South Platte River, at any point selected between the Platte Canon and the mouth of Cherry Creek, and conduct the water so diverted to the cities of Denver, Auraria and Highlands for mechanical, agricultural, mining and city purposes. The purpose of the company was to construct a ditch to carry water to irrigate trees within the municipalities named, and also to furnish water to farmers cultivating land under the ditch. The construction of the ditch was commenced in 1865. In 1867 the name of the corporation was changed to The Platte Water Company. In 1875 or 1876, this company entered into a contract with the city of Denver, whereby it leased the ditch, as then existing, with all its rights, privileges and franchises, to the city, and also agreed to sell to the city the ditch and rights leased for the sum of sixty thousand dollars, with interest, in six annual installments. These payments were made and the city then became the beneficial owner of the ditch, and such rights connected therewith as the vendor could convey. Prior to the commencement of the construction of the ditch, other ditches on the river were purchased by the original company. In 1883, under a statutory adjudication of water rights for the purpose of irrigation, the ditch was awarded priority No. 1, of date November 28, 1860, for so much water, 18 inches in depth, as would flow through a ditch having a grade of four and one-half feet to the mile, ten feet wide on the bottom and thirteen feet wide at the top; also two other priorities, dated

respectively November 1, 1873, and March 7, 1881. It is not necessary, however, to state the volume awarded by these two priorities, as these matters are not material to any questions presented for determination at this time. It is the right to the use of water represented by these priorities which is involved.

The testimony introduced by the respective parties bearing on this subject is exceedingly voluminous, covering several thousand folios, and the abstract of the record proper and testimony consists of over seven hundred pages. It is evident the court disposed of the case upon an entirely erroneous theory, greatly to the prejudice of appellant, and perhaps other parties to the action; but as the parties are numerous, and to go through the testimony with the care necessary to properly determine their respective rights would require a very considerable time, we shall only state in a general way so much of the testimony as may be necessary to direct attention to the material facts upon which the rights of the parties depend under the rules of law applicable, it being our purpose to merely declare, in connection with the principal facts, such principles of law as will serve to point out the errors committed, and enable the trial court, from the pleadings and testimony reported by the referee, to determine the material facts in detail and render a correct decree.

At an early date individuals began to take water from the ditch for the purpose of irrigating lands. The water thus obtained was secured under contracts entered into from time to time, between this class of consumers and the then owners of the ditch. These contracts were only for the irrigating season during the year they were executed; that is, they only covered the irrigating season for the year they were made. The testimony discloses that in many instances, at least, the use of water by

these consumers was intermittent; that is, they would contract for and use it a year or so, and then cease to contract for or use it for a period, when they would again resume the use of water in the same intermittent way. On this testimony the court held that these consumers were in no wise affected by the contracts made with either the city or its predecessors, for the reason that they were appropriators, to all intents and purposes, from the river, with the right in the city to exact a reasonable compensation for carriage, and that the rights thus acquired vested and continued from the date the consumers or their predecessors first utilized water from the ditch unless lost by abandonment. Error is assigned on this ruling.

The original company was organized to divert and carry water for mechanical, agricultural, mining and city purposes, but so far as any question is involved in this case with respect to the priorities awarded it, we think it and its successors in interest, so far as the rights of the individual consumers are involved, must be treated as an irrigation canal company, carrying water for hire. Such a company is a *quasi* public carrier for the purpose of conveying water from natural streams to places where it may be applied to a beneficial use. It is not the proprietor of the water which it is entitled to divert, but must be regarded as an intermediate agency existing for the purpose of aiding consumers in the exercise of their rights to appropriate water, as well as a private enterprise prosecuted for its benefit.—*Farmers' I. D. Co. v. Agricultural D. Co.,* 22 Colo. 513, 45 Pac. 444, 55 Am. St. Rep. 149; *Wright v. Platte Valley I. Co.,* 27 Colo. 322, 61 Pac. 603; *Wheeler v. Northern Colo. I. Co.,* 10 Colo. 582, 17 Pac. 487, 3 Am. St. Rep. 603; *Wyatt v. Larimer & Weld I. Co.,* 18 Colo. 298, 33 Pac. 144, 36 Am. St. Rep. 280.

A consumer supplied with water by contract from a

ditch owned and operated by. a carrier company in a sense is an appropriator from the stream supplying the ditch, but does not occupy the exact status of an independent appropriator directly from the stream, as his rights are limited by the terms of his contract, so far as valid, with the ditch company, as well as other limitations which the law, from the nature of the relation between the carrier company and a contract consumer from its ditch, imposes. *Wright v. Platte Valley I. Co., supra; City and County of Denver v. Walker,* 45 Colo. 387, 101 Pac. 348.

Having contracted for and beneficially used for irrigation purposes a specific volume of water for any particular year, without any valid limitation as to future use, he would be entitled to the same volume each year succeeding, when needed for the purposes of irrigation, upon tender, annually, without intermission, of the rate which the company could lawfully exact, and compliance with its rules and regulations, so far as reasonable. *Northern Colo. I. Co. v. Richards,* 22 Colo. 450, 45 Pac. 234; Sec. 2297, 2 Mills' Stats.

When, however, his contract expires by limitation, and is not renewed, and he does not take the necessary steps to preserve the status growing out of his contractual relation with the carrier, his rights to a future use of water from the ditch cannot be based upon past use. In other words, his contract with the carrier is for carriage, and his rights are limited by its terms, so far as valid, to the volume of water for the period mentioned in his contract. On the expiration of his contract he may be entitled to have it renewed, unless inhibited by a valid provision therein; but if a legal demand for that purpose is not made, he is in the same position as though he had never taken water from the ditch.

A consideration of the duties and obligations of carrier ditch companies conveying water for irrigation purposes for hire and the rights of contract users and others who can beneficially apply water from the canals of such companies to the irrigation of lands, will demonstrate that the rights of contract users of water from companies of that character are measured and limited as indicated. When such a company has water subject to its control, *bona fide* applicants are entitled to its use for irrigation purposes upon tender of the lawful rate for carriage and compliance with the reasonable rules of the carrier. *Combs v. Agricultural D. Co.*, 17 Colo. 146, 28 Pac. 966, 31 Am. St. Rep. 275; *Golden Canal Co. v. Bright*, 8 Colo. 144, 6 Pac. 142; *Wheeler v. Northern Colo. I. Co., supra.*

As previously noted, the object of a carrier company is two-fold, namely: To aid consumers in obtaining water, and for its private gain. When a mere contract consumer severs his relation with the carrier, the latter is not required, for that reason alone, to permit the volume which it had theretofore diverted from the stream for the benefit of the consumer to remain in the source of supply. If the rule were otherwise, and a contract consumer became an appropriator from the river, in the full meaning of that term, as held by the trial court, then the carrier would be compelled to await the pleasure of the contract consumer with respect to the use of water after once contracting with him, and its revenues would be dependent upon his whim, while others in the interim would be deprived of the use of the volume which the prior contract consumer had once utilized, but had ceased to use. The law does not permit such unjust and anomalous results to grow out of the relation of carrier and simple contract users. The priorities awarded a carrier ditch are for the benefit of those entitled to use the water which they represent. This means those who are entitled

to be supplied with water from the ditch, to which the priorities are awarded. When these rights are evidenced by a contract between the consumer and carrier for a specified volume for a specified period, the obligation assumed by the carrier is to deliver that volume for the period and purpose named in the contract. That is all the consumer contracted for. Such a contract is in no sense illegal or against public policy, and the consumer will not be heard to say that his contract conferred greater or different rights than those specified, save and except that having once become a contract user, he will be entitled to continue that relation from year to year thereafter, without intermission, however, unless limited in the exercise of this right by a valid provision in his contract, upon tender annually of a lawful rate of carriage, and compliance with the reasonable regulations of the carrier. The rights of the contract consumer as thus defined, afford full protection to all. When the consumer's contractual relations with the carrier are severed, the obligations of the carrier are ended, and the consumer cannot complain because the rights of others have intervened by contract with the carrier for the use of water. That is their right, when the carrier has water undisposed of; and if it refuses the request of *bona fide* applicants, it can be compelled to comply with their needs to the extent it has water which it can lawfully control. If a mere contract user becomes an unqualified appropriator of water from the river supplying a carrier ditch, then certainly he ought to be required to compensate the carrier for the carriage of water, whether he is using it or not; and yet, we apprehend that when his contract expired, if the carrier should undertake to exact such compensation, his complete defense would be that his contract did not impose any such an obligation. The unjust results which would follow in ruling that a mere contract user is an unqualified appropriator make it

apparent that his right is limited by the terms of his contract, so far as valid, and that when he voluntarily ceases, at the expiration of his contract, to exercise his right to continue his contractual relations with the carrier, or preserve the status growing out of that relation, that his future rights only date from the time he again contracts with the carrier for water, or makes a demand to be supplied with water in circumstances with which the carrier is legally bound to comply. This conclusion logically leads to the further one, that parties to the action who, from their pleadings and proof, did not establish that the city, as the beneficial owner of the ditch, was under any obligation to furnish them water at the time they became parties, were without any rights which could be either adjudicated or recognized.

For a considerable period from the date contract users began to take water from the ditch, it is by no means clear as to how much these consumers, other than the city, used. In 1874 The Platte Water Company began entering into written contracts with consumers, and passed a rule concerning the method of measuring water taken from the ditch, which was to the effect that the water should be measured through boxes located at right angles to the ditch, with a pressure of one inch above the orifice. The contracts thereafter executed with consumers were explicit with respect to the manner of placing the boxes, their length, grade and pressure permitted in conformity with the rule mentioned, and limited the consumer to the carrying capacity of the boxes so placed for his use. After the city contracted to purchase the ditch, we think the evidence establishes that similar contracts were entered into between consumers and the city. All these contracts were entered into annually. The evidence discloses that many of the boxes were not maintained with a pressure of one inch, but in many instances at a much greater pressure, and that this was permitted

by employes of the owner of the ditch, but without the knowledge or consent of the owner. It also appears that the excess water thus obtained was not contracted or paid for by the consumers, who, by the means mentioned, secured more water than their respective contracts called for.

The trial court, upon the theory that the contract consumers were appropriators from the river, awarded them the volume actually applied to their land, even though in excess of the volume contracted for. This was clearly error, for the reason already given, to the effect that the rights of these contract consumers were limited by their contracts so far as valid. A provision in a contract between the consumer and carrier limiting the volume of water which the consumer is entitled to have delivered is valid. *Drach v. Isola,* 48 Colo. 134, 109 Pac. 748.

Some of the consumers of water or their grantors executed to The Platte Valley Water Company, before it sold to the city, right of way deeds, in which it was provided that "The Platte Water Company, its successors or assigns, shall, from year to year, deliver water to the grantor, his heirs or assigns, for irrigation, if applied for on or before the fifteenth day of May of each year, under the rules, conditions and regulations governing the sale of water for irrigation, in 1874, to farmers under the ditch, but at a reduction of one-sixth of the rates charged for said year." The rights obtained by the grantors of such deeds, and their successors or assigns, are involved, as we understand from briefs of counsel that the court treated the grantors of such deeds and their successors in interest as appropriators whose rights continued from the date they first applied water to their lands, unless lost by abandonment.

The stipulation mentioned does not bind the grantor

to take water for any particular length of time, or in any specified volume. The company agrees to carry a sufficient volume to irrigate the land through which the right of way was granted, upon condition, however, that the grantor applied on or before May 15th of each year. This does not obligate the grantor, in any manner, but gives him a right more in the nature of an option, which he may exercise at his pleasure. If he declines to take water for any year, no liability attaches on account of his refusal, and no cause of action accrues against him as for breach of contract. In brief, the stipulation provides, substantially, for a continuous series of transactions in the way of annual contracts, which it is optional with the grantor to enter into. *South Boulder & R. C. D. Co. v. Marfell,* 15 Colo. 302, 25 Pac. 504. In order to protect this right, as against others applying to the ditch company for, and securing water, and retain the status he occupied at the time the deed was executed and delivered, the grantor or his successors must have exercised the right reserved in the deed each year. In this respect he stands exactly on the same plane as any other contract consumer, and if he neglects or fails to take water annually from the date his right to do so accrued, then his status with respect to other consumers would date back from the time he began to exercise uninterruptedly the right reserved in his deed.

While on the subject of considering the right of way deeds executed by certain appellees or their predecessors, containing the reservation above noted, we will consider the claim to the use of water made by the representative of E. J. Sanderlin, deceased. This claim was denied by the trial court. His representative contends that this was error. It is doubtful if the question is properly here for consideration, but it is not raised by counsel for appellant, and we will consider the matter on its merits. Sanderlin's deed was executed and delivered in 1874, and

contained the stipulation to which we have referred. About three years later he sold his land through which the right of way was granted, reserving his water right evidenced by the stipulation in his right of way deed. According to his testimony he applied to the company for water after he sold his land in 1878 or 1879, and thereafter, from time to time. His demands were refused. It appears that he did not have any land during all this period upon which the water he claimed to be entitled to could be applied, or that he could make any beneficial use of such water. In such circumstances his demands were properly refused. An appropriator of water, or one having the right to utilize it for a beneficial purpose, is not entitled to have water turned out to him unless he can beneficially use it. Not having any land upon which the water could be applied, nor any use for the water, it would have been waste to comply with his demands, and he gained nothing by making them. We think the trial court was right in denying this claim.

Error is also assigned upon the ruling of the court, that deeds conveying land upon which water had been applied by contract consumers also conveyed whatever water right was thus acquired in connection with such land, regardless of whether there was any proof of a conveyance of water rights from the original user. This question only becomes material in those instances where the contractual relation upon which the water right claimed is based continued without interruption between the grantor and ditch company, and thereafter between his grantee or successors and the company, and it is, therefore, only necessary to state the rule which governs in determining whether a deed to land conveys a water right. Whether a deed to land conveys a water right in connection therewith depends upon the intention of the grantor to be gathered from the terms of the deed, or where it is silent on the subject, from the circumstances

surrounding the transaction. *King v. Ackroyd,* 28 Colo. 488, 66 Pac. 906; *Bessemer I. D. Co. v. Woolley,* 32 Colo. 437, 76 Pac. 1053, 105 Am. St. Rep. 91; *Travelers Ins. Co. v. Childs,* 25 Colo. 360, 54 Pac. 1020; *Daum v. Conley,* 27 Colo. 56, 59 Pac. 753; *Gelwicks v. Todd,* 24 Colo. 495, 52 Pac. 788; *Arnett v. Linhart,* 21 Colo. 188, 40 Pac. 355.

The court awarded the city the right to only 41 statutory inches of water out of the first priority, and 255 statutory inches out of the second priority, and something over 1,200 inches out of the third priority. This third priority, it seems to be conceded by all parties, is not of much value.

It is quite clear from the testimony that the use of water by the city began with the year 1869, and perhaps earlier. In that year it contracted for one thousand dollars' worth of water; the next year, for forty-five hundred dollars' worth; and thereafter, down to the time it contracted to purchase the ditch, for six hundred inches, then known as "square inches," for which it paid several thousand dollars annually. This water was used by the city principally for irrigating shade trees upon its streets, and also, to some extent, to irrigate trees on lots. After the purchase of the ditch by the city, we think the evidence discloses that its use of water for the purpose mentioned was greatly increased, it reaching, some years, as much as twenty-five hundred inches. Along in the nineties, the city began to use water for irrigating its parks and filling lakes in parks. By the year 1899 it ceased to use the water upon the streets altogether, and applied water only to the irrigation of its parks and filling the lakes. From the evidence, it appears that while the volume of water used in filling lakes and irrigating parks was not as great as had theretofore been applied to the irrigation of trees on the streets, that it was the intention of the city to increase its park area,

and that the decreased use was temporary, only. It also appears from the testimony that when the park area is increased, as contemplated, the city will require all the water which it had theretofore applied to the irrigation of trees upon its streets.

We think the evidence also establishes that from the time the city began to use water for the purposes mentioned, its use was continuous each year (but in what volume we shall not undertake to determine), until in the nineties, its direct use was decreased. In the briefs for the city it is asserted (and not denied by counsel for the appellees) that the trial court ruled that consumers who were farmers and using the water for the purposes of irrigating crops had a better right to the use of water than the city had for irrigating trees for shade upon its streets, or the irrigation of its parks and the filling of lakes and reservoirs, and that, therefore, the city's right to the use of water should be subordinated to any and all claims upon the part of consumers using water for the irrigation of crops, and that this ruling resulted in reducing very materially the volume of water to which the city was, in fact, entitled out of the respective priorities awarded its ditch. Irrigation means the application of water for the purpose of nourishing plants. We think the application of water to grow trees upon streets and to irrigate trees, shrubs, grasses and other plant life usually grown in parks, constitutes the use of water for irrigation just as much as the application of water to grow crops upon farms. Both uses are for the purpose of nourishing useful plant life, and therefore neither one is in any sense superior to the other, or entitled to preference over the other. Whether the city would be entitled to use water to fill lakes in its parks in preference to individual contract consumers using water for the irrigation of farm lands, it is not necessary to determine, as it appears to us that when the rights of the various con-

sumers are adjudicated in accordance with the rules of law announced in this opinion, all parties to the proceeding entitled to water for strictly irrigation purposes will be supplied, and that there will still be a considerable surplus left in the priorities awarded the ditch, the right to the use of which for irrigation purposes is not involved at this time.

In 1894 the several consumers, including the city, were taking practically all the water the ditch could furnish. At that time the city provided in contracts entered into with the consumers that the use of water contracted for should be subject to the needs and requirements of the city as a user, and in many of them it was provided that the use should be only for the year mentioned in the contract. Generally speaking, these contracts were signed under protest, as water was refused consumers unless they signed contracts containing these limitations.

This brings us to the consideration of two questions, namely: The validity of the limitations mentioned in the contracts; and whether the city, by gradually ceasing the use of water up to about 1899, lost any of its rights.

At the time the city was exacting these contracts it was the beneficial owner of the ditch and had been for something like 18 years. Its use of water as a contract consumer was continuous each year from the time it first began to apply water to the irrigation of shade trees on the streets of the city. When it became the beneficial owner of the ditch this use was continued without interruption, except that some time in the nineties the volume it used was to some extent decreased. It intended, however, to resume the full use later. As stated, the contracts under consideration were executed subject to the needs and requirements of the city as a user. As to consumers entitled to water from the ditch by virtue of prior user,

we think these conditions were invalid in so far as they related to the volume which such consumers were entitled to have turned out to them, for the reason that to this extent their rights had attached, and they could not be deprived of them unless they voluntarily consented. As to any excess water for which these consumers contracted by contracts containing these limitations, or as to those whose rights were initiated under these contracts, the limitations imposed must be treated as a lease of the water, the right to the use of which the city had theretofore acquired and, therefore, to this extent are valid. We are also of the opinion that the use of water under these contracts by consumers, bound by the limitations imposed, preserved the status of the city the same as though it had utilized the water covered by these contracts for its own needs. In other words, by these contracts it leased its rights to the water which it had acquired as a consumer above that necessary for its present needs, and hence preserved them to all intents and purposes exactly as though it had continued the use of such water. *The Cache La Poudre Ir. Co. v. Larimer and Weld Co.*, 25 Colo. 144, 53 Pac. 318, 71 Am. St. 123.

In fixing the rights of the consumers the trial court apparently awarded the early consumers or their successors the right to have the volume to which they were entitled supplied out of the first priority awarded the ditch; others the right to the use of the water from the second priority; and still others out of the third; and, in some instances, apportioned the rights of the consumers in all three of the priorities; that is, the rights of the consumers in the respective priorities appear to have been based upon the order their rights attached, according to the date of their respective contracts. It may be that, when the facts justify it, consumers of water supplied through the same ditch would have different priorities of right. Such, however, is not the general rule.

On the contrary, all consumers, generally speaking, have the right to be supplied from all the priorities decreed the ditch through which they are supplied, whose rights by virtue of prior use aggregate the volume of such priorities, and in such circumstances stand upon an equal plane. In a case where the first appropriation decreed a ditch was designed for some particular purpose or enterprise, and later priorities awarded were to supply a different class or group of consumers from the first. then the later priorities would be as distinct as if used through separate canals, and the rights of the different classes of consumers would attach only to the respective priorities awarded for their respective use. What the testimony may establish on the subject of whether the several priorities decreed the ditch were awarded to supply distinct classes of consumers, we do not express any opinion. If it does not, then the consumers, including the city, entitled to be supplied with water through the ditch in question, whose aggregate rights equal the aggregate volume of priorities awarded the ditch, stand upon an equal plane, and the water privilege of each extends alike to all the water decreed the ditch.

As stated in the early part of this opinion, we did not purpose going into the testimony in detail, in order to ascertain in what specific instance the decree of the court was erroneous; but as it was clear the court had adopted an erroneous theory in disposing of the case, much to the prejudice of the appellant, we would refer to such material facts as were necessary to consider in announcing the rules of law which must be applied in fixing the relative rights of the parties to the action. We think, so far as we are able to gather from the briefs of counsel, that we have done so, and that from the pleadings and evidence, the trial court, with the aid of counsel, by a careful consideration of the very voluminous pleadings and testimony, can ascertain the facts upon which

a decree should be based, in accordance with the views expressed in this opinion. We shall, therefore, vacate the judgment and decree of the trial court as to all parties to whom an award was made, but as to those denied an award, the judgment and decree will not be disturbed, and remand the cause for proceedings as herein directed. In remanding the case for disposition as indicated, the court will dispose of it without any further pleadings or testimony, except, if offered, testimony to establish the relative rights of the parties in and to the respective priorities awarded the ditch should be received and considered.

In fixing the rights of individual contract consumers the decree must provide, in an appropriate way, for the payment of lawful carriage rates, and that while the decree will put in permanent form the relative rights of contract consumers, it must be borne in mind that these rights are based upon contracts, and that they may be lost, if the parties only intermittently avail themselves of the right to exercise and enjoy them. The decree should make appropriate provision in this respect, so that the city, as well as the *bona fide* applicants for water from the ditch in the future, may be fully protected.

*Judgment vacated in part and cause remanded with directions.*

Decision *en banc.*

Decided November 3d, A. D. 1913. Rehearing denied February 2d, A. D. 1914.