No. 14,448.

CITY AND COUNTY OF DENVER *v.* SHERIFF ET AL.

(96 P. [2d] 836)

Decided October 23, 1939. Rehearing denied December 4, 1939.

194

Mr. MALCOLM LINDSEY, Messrs. DINES, DINES & HOLME, Mr. GLENN G. SAUNDERS, Mr. R. H. WALKER, Mr. HAROLD D. ROBERTS, for plaintiff in error.

Mr. FRANK DELANEY, Messrs. MOYNIHAN-HUGHES, Messrs. TUPPER, SMITH & HOLMES, for defendants in error.

Mr. ERSKINE R. MYER, Mr. HAROLD B. NEWROCK, amici curiae.

*En Banc.*

MR. JUSTICE OTTO BOCK delivered the opinion of the court.

THIS controversy relates solely to those portions of a general water adjudication decree affecting the alleged water rights of plaintiff in error, hereinafter referred to as the city.

March 1, 1918, the city acquired from the Denver Union Water Company, a water system which had for many years prior thereto served it and others as a private public utility. At that time the water sources of the

system were the South Platte river and its tributaries. It is now known as the Denver Municipal Water System. In addition to the rights acquired from the Denver Union Water Company, the city acquired, prior to 1918, valuable water rights, including decrees for irrigation. These rights are used in part for the irrigation of parks within the city limits of Denver and in part for the irrigation of land outside of Denver. Other rights in various irrigation ditches also have been acquired. The petition of the city to adjudicate its rights involved herein alleges claims of priorities for irrigation and for purposes other than irrigation from the Western Slope.

The present population served by the city's water system is approximately 350,000. It has been a constant and serious problem for the municipality to obtain sufficient and adequate water to supply its citizens and the area contiguous to the city which it is under legal obligation to serve. The water sources, with the exception of the projects involved in the instant case, have, as previously stated, been the South Platte river and its tributaries. The water flow in this river is extremely variable. The stream and the yield from the water rights of the city originating therefrom is far from uniform. Moreover, the population of the city and in the areas contiguous thereto is showing a healthy growth. In 1918, when Denver acquired its water system, the population was between 150,000 and 200,000. The population served by the system at this time is approximately 350,000. The city has not been unmindful of its obligation to seek further water sources for its growing needs. As early as 1914 its Public Utilities Commission made investigation through employed engineers. After the city acquired the Denver Union Water Company, and in 1921, it caused a location survey to be made for projects of Western Slope water, and particularly the Fraser river and Williams Fork diversion projects, these latter being involved in the instant case, and which the trial court decreed as of July 4, 1921, as the appropriation

date. The filing of the map for these projects with the state engineer occurred January 28, 1922. The claims as filed seek water for irrigation as well as for domestic and other purposes. To bring water over the divide so that it may be applied to a beneficial use by the city, engineering and financial problems always have been a matter of serious concern. Several futile attempts were made until the successful culmination in the organization of the Moffat Tunnel District in 1922, which provides two tunnels, one for rail transportation and a similar one for irrigation purposes. The tunnel commission continued work on the water tunnel until January 2, 1929, when it was turned over to the city by lease, under the terms of which provision was made that it be finished by the lessee and placed in operation to bring water to Denver. The expense of the construction of the water tunnel is estimated at $5,000,000. At the time of the trial it had a usable capacity of 600 second feet per second of time. When completed and lined its capacity will be 1280 cubic feet per second. In addition to the completion of the water tunnel by the city to a capacity of 600 second feet, it constructed various gathering ditches, conduits, diversion works, tunnels and pipelines necessary to bring the water to Denver at an expense of approximately $12,000,000. It is hoped that by this development about 74,000 acre-feet of water will be made available at a cost of approximately $160 per acre-foot, which it is asserted is a considerably higher sum than farmers could afford to expend for water for the irrigation of agricultural land.

The decree here involved is in three separate parts, the first relating to the Fraser river diversion project, the second to the Williams Fork diversion project, and the third to the Williams Fork reservoir. In view of the questions presented by the assignments of error, we deem it unnecessary to describe in detail these three projects, and we refer to them collectively as the Western Slope waters. As related to the Fraser river diver-

sion project, the court found and decreed "that the maximum rate of diversion of water through said project accomplished prior to the date of this decree is 335 cubic feet per second." The balance of the appropriations are decreed conditionally upon actual diversion and storage within a reasonable time from the date of the decree to the maximum of 1280 cubic feet per second, this being the completed carrying capacity of the Moffat water tunnel. No issue is here made as to time, volume or waste. Nor is there any conflict of priority of appropriation involved. The assignments of error raise but two questions, namely:

First, that the trial court, in giving the city its priorities from the Western Slope streams, made such priorities subject to unlawful and burdensome restrictive conditions; and, second, that the trial court denied the city any priorities whatever for general irrigation purposes.

In each of the three divisions of the decree we find the paragraph of which the city complains, as follows: "Any waters decreed herein, whether decreed therefor to be for direct flow or for storage, and whether the said decree be absolute or conditional, be diverted, taken and used as supplemental to the decreed water rights now belonging to claimant, which said decrees are from the waters of the natural streams of the State of Colorado and that the said claimant be required to satisfy its needs for waters from said existing decrees owned by it before it shall be held to require or need waters herein decreed or shall be entitled to take the same. That the waters herein decreed shall be held by the said claimant as a water supply supplemental to its present supply of water available under water decrees which the said claimant now holds and to be used only to the extent necessary to fill the needs and requirements of the claimant for municipal purposes, after it has made full and economical use of the waters available to it under water decrees now owned by it."

■ At the outset it is well to reiterate what we said in *Conley v. Dyer,* 43 Colo. 22, at page 28 (95 Pac. 304), relating to established legal principles as applied to water rights: "No principle in connection with the law of water rights in this state is more firmly established than that the application of water to a beneficial use is essential to a completed appropriation. Compliance with the law in other respects, that is: the filing with the clerk and recorder of the requisite plats and notices; the commencement and construction of the ditch or canal with due diligence; and even the actual diversion of water from the natural stream—all of these acts unaccompanied by the beneficial use of the water, constitute but an inchoate right or interest. And unless such beneficial use follows, the interest thus acquired does not ripen into an appropriation; the inchoate right terminates and the water goes to junior claimants who have complied with all the requirements of law. Moreover, it is equally well settled that in order to give the appropriation a priority dating from the commencement of the ditch or canal, the beneficial use of the water must take place within a reasonable time from such date; what shall constitute this reasonable time depending upon the facts and circumstances connected with each particular case."

It will be noted that the restrictions relate to "water decrees now owned by it," being the Eastern Slope water rights, and "any waters decreed herein" being the Western Slope water rights.

■ We shall first discuss these restrictive conditions to the decrees of the city as they relate to its Eastern Slope water rights. These appropriations are all based upon unconditional and absolute decrees. That they take on the attribute of property rights cannot be questioned. Counsel for defendants in error do not question this. This carries with it the right, under certain circumstances, to lease, sell and convey title. *Fort Lyon Canal Co. v. Rocky Ford Co.,* 79 Colo. 511, 515, 246 Pac. 781;

*La Plata River Co. v. Hinderlider,* 93 Colo. 128, 25 P. (2d) 187; *Monte Vista Canal Co. v. Centennial Irr. Co.,* 22 Colo. App. 364, 123 Pac. 831; *Wyatt v. Larimer & Weld Irr. Co.,* 1 Colo. App. 480, 29 Pac. 906; *Strickler v. Colorado Springs,* 16 Colo. 61, 26 Pac. 313; *Comstock v. Larimer & Weld Res. Co.,* 58 Colo. 186, 145 Pac. 700; *Arnold v. Roup,* 61 Colo. 316, 157 Pac. 206; *Cache La Poudre Irr. Co. v. Larimer & Weld Res. Co.,* 25 Colo. 144, 150, 151, 53 Pac. 318.

In *Strickler v. Colorado Springs, supra,* we said (p. 70): "The authorities seem to concur in the conclusion that the priority to the use of water is a property right. To limit its transfer as contended by appellee would in many instances destroy much of its value. It may happen that the soil for which the original appropriation was made has been washed away and lost to the owner, as the result of a freshet or otherwise. To say under such circumstances that he could not sell the water-right to be used upon other land would be to deprive him of all benefits from such right. We grant that the water itself is the property of the public; its use, however, is subject to appropriation, and in this case it is conceded that the owner has the paramount right to such use. In our opinion this right may be transferred by sale so long as the rights of others, as in this case, are not injuriously affected thereby. If the priority to the use of water for agricultural purposes is a right of property, then the right to sell it is as essential and sacred as the right to possess and use. Blackstone says: 'The third absolute right inherent in every Englishman is that of property, which consists in the free use, enjoyment and disposal of all his acquisitions without any control or diminution save only by the laws of the land'."

In *Wyatt v. Larimer & Weld Irr. Co., supra,* the court uses the following language as related to property rights (p. 497): "When thus appropriated the party appropriating was regarded as having a proprietary interest,—a right of property in, and the title to the water appro-

priated and diverted, with the right to use, sell or loan it, like other property. By such appropriation and by reason of the diversion and separation of the water from the volume of the stream the title of the public or people was divested and the appropriator became the owner."

The trial court's purpose in these restrictive conditions is disclosed in the record, wherein it is stated: "In making this right a supplemental right to the rights already owned by Denver, we are guarding against the City of Denver going into the business of selling water or disposing of a part or all of her present water rights and substituting the water acquired or to be acquired in this proceeding for her present water supply."

In part, the express purpose is to prevent any sale, lease or alienation of the Eastern Slope water. This would operate to prevent the city from leasing Eastern Slope water to farmers, which, under certain circumstances, we have said it had a right to do. *Denver v. Brown*, 56 Colo. 216, 233, 138 Pac. 44. If the city, for some legitimate reason, desired to abandon or sell any of its Eastern Slope water, it would, by so doing, and under these restrictions, jeopardize its water rights on the Western Slope. The furnishing of an adequate supply of water to 350,000 people requires managerial judgment and involves an ever-changing problem. To so freeze and straight-jacket the city's Eastern Slope water rights, by the restrictions involved here, would be an arbitrary invasion of vested property rights of the city. *Comstock v. Larimer & Weld Res. Co., supra.*

■ ■ It seems that counsel for defendants in error do not fully comprehend the issues presented in this case. Throughout their brief they consider the problems involved as though they relate to an appropriation of water to a body of agricultural land. We agree with them that "The people are vitally interested in the future developments of the state." Most of the cases they cite concern controversies relating to priorities. No such

issues are involved in this case. It is the settled doctrine of this state that geographical advantage does not apply to water for beneficial use. Counsel miss entirely the outstanding fact that more than one-third of the population of the state is now seeking a measure of security in water supply by the construction and operation of a water system on which there has been expended approximately $12,000,000. The concern of the city is to assure an adequate supply to the public which it serves. In establishing a beneficial use of water under such circumstances the factors are not as simple and are more numerous than the application of water to 160 acres of land used for agricultural purposes. A specified tract of land does not increase in size, but populations do, and in short periods of time. With that flexibility in mind, it is not speculation but the highest prudence on the part of the city to obtain appropriations of water that will satisfy the needs resulting from a normal increase in population within a reasonable period of time. *Colorado Springs v. Colorado City*, 42 Colo. 75, 85, 86, 94 Pac. 316. "Courts are not to shut their eyes to the realities of business life." *Barkin Construction Co. v. Goodman*, 221 N. Y. 161, 116 N. E. 770.

■ ■ The validity of the restrictions as applied to the city's Eastern Slope decrees also is challenged from a procedural standpoint. Only courts in which unconditional decrees to Eastern Slope water rights of the city have been originally adjudicated have jurisdiction to construe or modify such decrees. *Weiland v. Reorganized Catlin Co.*, 61 Colo. 125, 156 Pac. 596; *Farmers Ditch & Res. Co. v. Boyd Lake Res. & Irr. Co.*, 66 Colo. 29, 178 Pac. 561; *Bijou Irr. Co. v. Lower Latham Ditch Co.*, 67 Colo. 356, 184 Pac. 292; *Hazard v. Reservoir Co.*, 87 Colo. 364, 287 Pac. 854. The restrictions, as they affect the Eastern Slope water rights, are, therefore, invalid. That it was the intention and purpose of the trial court to restrict these decrees cannot be questioned. Courts may not do indirectly that which they are without power

to do directly. *Comstock v. Larimer & Weld Res. Co., supra.*

■ Concerning these restrictions as applied to the 335 cubic feet of Western Slope water awarded the city as an absolute appropriation, such restrictions are a novelty in a water adjudication decree. True, no one has a property right in, or the right to sell or lease, water which has not first been legally appropriated. The system operated by the city embraces reservoirs of considerable magnitude. Much of the appropriated water when it reaches these reservoirs located on the Eastern Slope, cannot be returned to the public stream from which it was diverted. This statement also applies to water stored in the city's water system. The possession of the water is different in character from that which is used solely for agricultural purposes.

■ We do not here controvert the general rule recited by counsel for defendants in error as announced in *Ft. Lyon Canal Co. v. Chew,* 33 Colo. 392, 81 Pac. 37, as follows: "The general rule is that when an appropriator has no present need of water for irrigating his lands, he must not divert it from the natural stream, but it is his duty to let it flow in the natural channel to be enjoyed by other appropriators as their numerical priorities entitle them. If a senior appropriator who has not such need for his own land may disregard the usual rule and pass over one or more appropriators who are junior to him and confer upon other appropriators, who are junior to those ignored, his senior rights, it is his duty to show the facts that justify the departure."

It will be noted that we there referred to "need of water for irrigating his lands." Our problem here relates to the need of water for municipal purposes. This difference has received legislative recognition in the enactment of chapter 172, S. L. '31 (section 398, c. 163, '35 C. S. A.), which is as follows: "In the event any municipal appropriator of water having a population of in excess of two hundred thousand (200,000) people

shall hereafter lease water not needed by it for immediate use, no rights shall become vested to a continued leasing or to a continuance of the conditions concerning any return water arising therefrom, so as to defeat or impair the right to terminate the leases, or change the place of use; provided, however, that any leasing shall not injuriously affect rights theretofore vested in other appropriators; provided, further, that nothing herein contained shall authorize an appropriator to recapture water for a second use after it has once been used by it."

This section does not attempt to change the status of any individual who has applied water to a beneficial use, nor does it attempt to grant a right to any water held by others. It does recognize certain practical problems related to municipal water systems, as related to beneficial use. The term "beneficial use" is not defined in the Constitution. What is beneficial use, after all, is a question of fact and depends upon the circumstances in each case. What chapter 172, supra, recognizes is that cities having a population of 200,000 and over may, for reasons already stated, have not only the right to appropriate a sufficient volume of water for immediate use, but by prudent management to acquire by appropriation an adequate supply for a reasonable time in the future. What such a reasonable time would be is not presented on this review. That such water must first be applied to a beneficial use by the city before it has any property right in it is not disputed. All we now say is that the factors which enter into a determination of a beneficial use here, which is based upon a normal need, are more flexible than those relating to the use of water on agricultural land. The construction of a great distribution system necessarily involves a large financial investment. That such investment may be entitled to a return derived from a leasing of water not necessary to the city for immediate use, has heretofore received our implied approval. *Colorado Springs v. Colorado City, supra.*

The trial court at first, concerning the Fraser river project, found as follows: "The Court finds that 335 cubic feet of water per second of time have been diverted by the City and County of Denver and put to beneficial use this year and an absolute decree is ordered for 335 cubic feet of water per second of time." Subsequently, when prepared forms of decree were submitted, it incorporated the restrictions of which complaint is made. This was error. There was no basis in the evidence for any findings for supplementary use to its appropriations on the Eastern Slope. The maps, filings and petitions presented no such issue. When the court found that the city had diverted and applied to a beneficial use 335 cubic feet, that appropriation ripened into a property right, without any restrictions except those which the Constitution and the laws of this state impose. "A right to the use of water is limited in time and volume to the extent of the needs of the party in whose favor such right is established for the purpose named. The law reads this limitation into decrees establishing such right." *White v. Nuckolls,* 49 Colo. 170, 112 Pac. 329. In agricultural pursuits the beneficial use is limited to the needs of the land. In the instant case the beneficial use is limited to the needs of 350,000 present consumers, with a reasonable expectancy of an increase in the number of consumers as a normal condition. That this need, in the very nature of things, cannot be measured by the same factors as that of agricultural lands has already been mentioned.

The city relies on the case of *Denver v. Brown, supra.* It is said that relying thereon and on chapter 172, supra, it has made an investment of a large amount of money. Referring to that case, counsel for defendants in error say in their brief: "* * * in no subsequent Colorado case has this case been relied upon as authority for the point at issue herein." We know of no subsequent case, and none is cited, where this point was

in issue. It should be noted in passing that this case was decided before the city took over the municipal water system, involving a far greater volume of service. It also was decided long prior to the enactment of chapter 172, supra. If there was reason then for the principle laid down in the Brown case that the city may lease water under certain circumstances there stated, that reason is greatly intensified by the city's operation on a wider scale in the distribution of water under its since-acquired system. In that case the city was treated both as a consumer and a carrier of water. So far as the rights of the individual consumers there involved were concerned, as related to the priorities awarded, the city was treated as an. irrigation canal company, carrying water for hire. As to the issue of the leasing to others of water which the city had theretofore acquired, above that necessary to its present needs, it was treated as a consumer. It may not be amiss to refer briefly to some of the historical aspects appearing in that case. The complaint was filed July 2, 1902, to enjoin the city from interfering with the alleged water rights of plaintiffs, and to restrain the city from diverting water to other ditches and streams. The decree was entered June 15, 1908. Our decision, which was en banc, reversing the decree, was handed down November 3, 1913, without a dissent. Rehearing was denied February 2, 1914. March 17, 1917, the city filed with us as an original proceeding a petition for a mandamus writ to compel the district court to enter a decree in accordance with the judgment and opinion in the case of *Denver v. Brown, supra.* We, in an en banc decision, made the writ absolute July 2, 1917, without a dissent and denied a rehearing November 5, 1917. *People ex rel. v. District Court,* 63 Colo. 511, 168 Pac. 260.

That we carefully, deliberately and without haste considered the issues in. *Denver v. Brown, supra,* cannot be questioned. The litigation occupied the attention of this

court during a period of more than five years. As related to the issues here, it never has been modified or reversed.

Referring to the validity of the limitations in the contracts in issue in that case, and to the leasing of the city's water, we said (pp. 232, 233): "At the time the city was exacting these contracts it was the beneficial owner of the ditch and had been for something like 18 years. Its use of water as a contract consumer was continuous each year from the time it first began to apply water to the irrigation of shade trees on the streets of the city. When it became the beneficial owner of the ditch this use was continued without interruption, except that some time in the nineties the volume it used was to some extent decreased. It intended, however, to resume the full use later. As stated, the contracts under consideration were executed subject to the needs and requirements of the city as a user. As to consumers entitled to water from the ditch by virtue of prior user, we think these conditions were invalid in so far as they related to the volume which such consumers were entitled to have turned out to them, for the reason that to this extent their rights had attached, and they could not be deprived of them unless they voluntarily consented. As to any excess water for which these consumers contracted by contracts containing these limitations, or as to those whose rights were initiated under these contracts, the limitations imposed must be treated as a lease of the water, the right to the use of which the city had theretofore acquired and, therefore, to this extent are valid. We are also of the opinion that the use of water under these contracts by consumers, bound by the limitations imposed, preserved the status of the city the same as though it had utilized the water covered by these contracts for its own needs. In other words, by these contracts it leased its rights to the water which it had acquired as a consumer above that necessary for its present needs, and hence preserved them to all in-

tents and purposes exactly as though it had continued the use of such water. *The Cache La Poudre Ir. Co. v. Larimer and Weld Co.,* 25 Colo. 144, 53 Pac. 318, 71 Am. St. 123."

It will be noted that the leased water applied to such as "the right to the use of which the city had theretofore acquired." That is all that the city can rightfully claim here. No double use is involved. After the water had been applied beneficially by the city, as the court found relative to the 335 cubic feet, it became the property of the city of Denver, and any such water for which there may at any given time in the future be no immediate need, may be temporarily leased by the city, in accordance with chapter 172, supra. The restriction of such use as is attempted by the decree here under consideration is invalid and an invasion of vested rights.

In *People ex rel. v. District Court, supra,* in a resumé of what we held in *Denver· v. Brown, supra,* we said (p. 513): "As to the excess water, which term will be comprehended by those familiar with the litigation, we held the limitations imposed by the city upon the users of this water, were, in effect, a lease of the amount not necessary for the city's present needs, and preserve the water privilege in the city, the same as though it had continued in the use."

We find that other western states concerned with similar problems are in harmony with this view. *Pocatello v. Murray,* 206 Fed. 72, 80; *Holt v. Cheyenne,* 22 Wyo. 212, 137 Pac. 876, 880; *Butler & Thompson Co. v. Ashland,* 109 Ore. 683, 22 Pac. 346, 347.

██ ██ We come now to the second question—a denial by the trial court to the city of any priorities to the Western Slope waters for general irrigation purposes. The decrees provide that the water "is being and will be used for all municipal uses, including domestic use, fire protection, street sprinkling, watering of parks, lawns and grounds, mechanical uses and every other

type of municipal use, and for maintaining adequate storage reserves."

Our constitutional provisions concerning the waters of natural streams designate four uses. Article 16, section 6, relates to preferences when the waters of any natural stream are not sufficient to supply all appropriators. The uses are classified as domestic purposes, agricultural purposes and manufacturing purposes. This classification becomes important when preferences are involved. No such issue exists in this case. Article 16, section 7, relating to rights of way for the purpose of conveying water, also mentions mining purposes. The need of water for the city's sewage disposal plant was expressly eliminated from the issues by the trial court, no evidence that water has been placed to a beneficial use for such purpose appearing in the record. The term "municipal uses" never has been used in connection with water adjudication proceedings before, to our knowledge. This term necessarily includes agricultural purposes within the city area. In *Denver v. Brown, supra,* the trial court ruled that consumers who were farmers and using water for the irrigation of crops had a better right to the use than had the city for irrigating trees on streets and lots. We said concerning that matter (p. 231): "Irrigation means the application of water for the purpose of nourishing plants. We think the application of water to grow trees upon streets and to irrigate trees, shrubs, grasses and other plant life usually grown in parks, constitutes the use of water for irrigation just as much as the application of water to grow crops upon farms. Both uses are for the purpose of nourishing useful plant life, and therefore neither one is in any sense superior to the other, or entitled to preference over the other."

Counsel for defendants in error say in their brief: "There is no question but that irrigation within the municipality is one of the recognized uses to be made of water by the city. This use was set out in the claims

filed, was testified to, and was allowed in the decree. There is no desire on the part of the defendants in error or on the part of the trial court to deny the City of Denver its right to use the appropriated water for all municipal purposes, including the irrigation of its parks, lawns and shrubbery."

It is, therefore, conceded that in so far as the 335 cubic feet of water per second of time absolutely decreed herein is concerned, it may be used for irrigation purposes within the area served by the Denver Municipal Water System. If it be true that consumers seeking water from the city in the municipal area involved, for any purpose, could obtain it only through the Denver Municipal Water System, then, because of its public utility status, the system would be legally required to serve such consumers. One of the problems in the case before us is whether the water not needed for immediate use, as distinguished from a normal need, under all the circumstances, could be leased temporarily to consumers for agricultural purposes outside of the city area. What the city's relations as a water carrier would be if an appropriator from Western Slope streams diverts water for agricultural use outside of the Denver system area is not now before us. No relation of carrier and consumer is involved in this case. In our opinion, there is no basis upon which the trial court could have made a finding of a beneficial use for irrigation outside of the area served by the Denver Municipal Water System. The need of water to satisfy beneficial use, contended for by the city, necessarily must apply to the system area. This, however, as we have heretofore stated, does not prohibit the city from leasing the water not needed for immediate use, under our decision in *Denver v. Brown, supra,* and chapter 172, supra, subject to the provisos therein. It, therefore, was not error for the trial court to deny the city an appropriation based on beneficial use for irrigation purposes outside of the Denver Municipal Water System area.

The cause is remanded with directions to modify the decree by striking therefrom the paragraph in each of the three separated divisions relating to the restrictions of which complaint is made. In all other respects the decree is affirmed.

Mr. Justice Burke and Mr. Justice Young concur in the result.

Mr. Justice Knous concurs specially.

Mr. Justice Knous specially concurring.

Substantially, as stated in the opinion of the court, the city of Denver here asserts, first, that in giving the city its priorities from the Western Slope streams the trial court erred in placing in the decrees certain restrictive provisions, which are set out in the opinion, and, second, that the trial court improperly denied the city any priorities whatever for general irrigation purposes. As to the first contention the opinion concludes that the trial court was wrong in inserting the questioned restrictive conditions in the decretal orders but resolved rightly concerning the second contention. In making this disposition the opinion states: "In our opinion, there is no basis upon which the trial court could have made a finding of a beneficial use for irrigation outside of the area served by the Denver Municipal Water System. The need of water to satisfy beneficial use, contended for by the city, necessarily must apply to the system area. *This, however, as we have heretofore stated, does not prohibit the city from leasing the water not needed for immediate use, under our decision in Denver v. Brown, supra, and chapter 172, supra, subject to the provisos therein.* It, therefore, was not error for the trial court to deny the city an appropriation based on a beneficial use for irrigation purposes outside of the Denver municipal water system area." With the result of this conclusion I agree, but my convictions require that I express my nonconcurrence with

the italicized portion of the foregoing statement which epitomizes more extensive expressions concerning the subject of leasing in other parts of the opinion.

The moment it is settled, as we have determined, that the attempted imposition of the challenged restrictions in the decree legally were unwarranted, the question of the right of the city, and its extent, to lease such water of the priorities herein awarded as may not be needed for its immediate use, in my opinion, becomes moot. In so far as the unwarranted restrictions may have affected any existing general right of the city in this particular, the prohibition automatically is banished by the striking of the questioned provisions from the decree.

It cannot be questioned that in *Denver v. Brown,* 56 Colo. 216, 138 Pac. 44, where, as Justice Bock in the opinion points out, the city appeared in the dual capacity of a consumer and carrier of water, limitations in agreements between the city and contracting agricultural users under the ditch, subjecting the delivery of water to the latter to the needs and requirements of the city were treated as leases of water and their validity upheld. Nor can it be doubted that section 398, chapter 163, '35 C. S. A. (c. 172, S. L. '31), quoted in the majority opinion, said by the city to be merely declaratory of the pre-existing law, presumably as announced in the Brown case, amounts to a legislative recognition of the status arising from the leasing of water not needed for its immediate use by a municipality of the class of Denver.

While these acknowledgments of *a* right to lease under the circumstances disclosed in the Brown case are pertinent here as showing the repugnancy of the denounced restrictions in the decree before us, I cannot believe they warrant the affirmative extension of at least an equivalent right to the priorities herein under consideration, as I believe the opinion of the court does.

I assume no one will contend that the position of the city in the Brown case has entire factual identity with

its role here as an appropriator from a natural stream. In the latter capacity, as is any appropriator of water, it is subject to all constitutional and statutory provisions designed to protect the rights of junior appropriators from the same source of supply. By operation of law these limitations are read into every decree. *Fort Lyon Canal Co. v. Chew,* 33 Colo. 392, 81 Pac. 37; *Baker v. Pueblo,* 87 Colo. 489, 289 Pac. 603; *New Mercer Ditch Co. v. Armstrong,* 21 Colo. 357, 40 Pac. 989; *White v. Nuckolls,* 49 Colo. 170, 112 Pac. 329.

None of these important considerations were directly involved in the Brown case nor in the case of *Colorado Springs v. Colorado City,* 42 Colo. 75, 94 Pac. 316, cited by the city as indicative of the power claimed. Even if the *power* of a municipal appropriator of water to sell or lease a portion of the same to third parties is conceded, its *exercise* nevertheless must be in harmony with the law controlling our irrigation system.

As I apprehend, the determination of the extent of the exercise of this asserted right must depend upon the circumstances of each given case as it may originate, and not by the pronouncement of a general principle or the extension of a decision arising under one state of facts to another and dissimilar situation.

Experience augurs that in future controversies physical facts, such as the season of the year, the flow of the stream, the uses involved, the need of the junior appropriators and the location of the diversion points, impossible of accurate forecast, will be of paramount and controlling importance. These situations should be met only when they arise and not be hypothetically prejudged.

It may be that the majority opinion contemplates that determination of these questions may be so reserved, but my apprehension that it implies otherwise, leads me to specially express the extent of my concurrence on this feature of the case.